EARTH ISLAND INSTITUTE, a California Nonprofit Corporation; Todd Steiner; The American Society for the Prevention of Cruelty to Animals, a New York NonProfit Corporation; and The Humane Society of the United States, a Delaware Nonprofit Corporation, The Sierra Club, a California Nonprofit Corporation; and the Georgia Fishermen's Association, Inc., a Georgia Corporation, Plaintiffs,

v.

Warren CHRISTOPHER, Secretary of State; Robert E. Rubin, Secretary of Treasury; Elinor G. Constable, Assistant Secretary of State for the Bureau of Oceans, International Environmental, and Scientific Affairs; Ronald Brown, Secretary of Commerce; and Rolland A. Schmitten, Assistant Administrator for Fisheries, National Marine Fisheries Service, Defendants,

and

National Fisheries Institute, Inc., Intervenor–Defendant.

Slip Op. 96–62.
Court No. 94–06–00321.

United States Court of International Trade.

April 10, 1996.

Legal Strategies Group, Emeryville, CA (Joshua R. Floum) for the plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division (Jeffrey M. Telep) and Environment & Natural Resources Division (Eileen Sobeck and Christiana P. Perry), U.S. Department of Justice; and Office of the Legal Adviser, U.S. Department of State (David Balton), Office of General Counsel, National Oceanic and Atmospheric Administration (Jason Patlis) and Office of the Chief Counsel, U.S. Customs Service (Lou Brenner, Jr.), of counsel, Washington, DC, for the defendants.

Garvey, Schubert & Barer, Washington, DC (Eldon V.C. Greenberg) for the intervenor-defendant.

Graham & James LLP, Washington, DC (Michael P. Daniels and Andrea Fekkes Dynes) for the government of El Salvador, amicus curiae.

### MEMORANDUM & ORDER

AQUILINO, Judge:

In 1989, following years of mounting concern over possible extinction of sea turtles, Congress enacted Pub.L. No. 101–162, § 609, 103 Stat. 988, 1037–38, 16 U.S.C. § 1537 note, part (b)(1) of which provides that the importation into the United States of shrimp or products from shrimp which have been harvested with commercial fishing technology which may affect adversely endangered species of sea turtles "shall be prohibited not later than May 1, 1991, except as provided in paragraph (2)", to wit:

(2) CERTIFICATION PROCEDURE.—The ban on importation of shrimp or products from shrimp pursuant to paragraph (1) shall not apply if the President shall determine and certify to the Congress not later than May 1, 1991, and annually thereafter that—

(A) the government of the harvesting nation has provided documentary evidence of the adoption of a regulatory program governing the incidental taking of such sea turtles in the course of such harvesting that is comparable to that of the United States; and

(B) the average rate of that incidental taking by the vessels of the harvesting nation is comparable to the average rate of incidental taking of sea turtles by United States vessels in the course of such harvesting; or

(C) the particular fishing environment of the harvesting nation does not pose a threat of the incidental taking of such sea turtles in the course to such harvesting.

In slip op. 95–208, 19 CIT ——, ——, 913 F.Supp. 559, 580 (1995), *appeal Nos. 96–1253, –1254 docketed* (Fed.Cir. March 12, 1996), familiarity with which is presumed, this court found the foregoing statute unambiguous and therefore confirmed the annual congressional deadline of May 1st for the defendants to prohibit

the importation of shrimp or products of shrimp wherever harvested in the wild with commercial fishing technology which may affect adversely those species of sea turtles the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987, 52 Fed.Reg. 24,244 . . . .

In handing down this opinion on December 29, 1995, the court did not consider itself at

liberty to change this statutory date to January 1 or June 1 or to some other date of arguable convenience to the parties.

## I

Nonetheless, and also seemingly in spite of the one and a half years' lead time originally afforded by Congress in the statute and the five first days of May since then, as well as the aforesaid four months' advance warning the timing of the court's decision entailed, come now the defendants (and the intervenor-defendant) with a motion for "modification" of that decision. It prays for an across-the-board, additional one-year extension of time to prohibit importation of shrimp or products from shrimp upon the condition Congress prescribed, *supra,* as well as for expedited hearing and determination thereof.

Such a hearing has been held, and the paucity of evidence offered in support of the motion enables this decision to be expeditious.

## A

As filed initially, the motion was predicated upon declarations by the Under Secretary of State for Economic, Business and Agricultural Affairs and defendant Schmitten. The former confirms what the court held unlawful in slip op. 95–208, namely, "the federal defendants implemented Section 609 on the belief that Congress intended that law to apply only to nations in the Wider Caribbean region." Declaration of Joan E. Spero, para. 4, p. 3. The declarant also confirms what the record indicated, Congress had recognized, and the court thus found in its decision, *i.e.,*

sea turtles are a shared resource; they do not occur solely in waters under U.S. jurisdiction, but rather migrate widely through waters under the jurisdiction of many nations and on the high seas. Effective protection of sea turtles can only result from *cooperative action among nations.* That is why Section 609 calls for the negotiation of international agreements to this end.

*Id.,* para. 15. *See, e.g.,* H. Fountain, *Navigation Satellites Have Rival: the Sea Turtle,* N.Y. Times, March 11, 1996, at C4. In this regard,

based on all presently available data, ... a majority of the nations of the world have at least one of the relevant species of sea turtles in waters subject to their jurisdiction as well as commercial shrimp trawling operations in those waters. Of those, approximately 51 nations, including the 14 nations of the Wider Caribbean region previously determined to be covered by Section 609, have exported shrimp or shrimp products to the United States in recent years. Approximately 60 additional nations have at least one of the relevant species of sea turtles and commercial shrimp trawling operations, but have not exported shrimp or shrimp products to the United States in recent years.

Declaration of Joan E. Spero, para. 6, pp. 4–5. The Department of State is reported to have

promptly notified foreign nations of the Court Order through U.S. embassies and consulates around the world ... [and to have] actively urged affected nations to adopt, by May 1, 1996, programs governing the incidental taking of sea turtles in the course of shrimp harvesting comparable to the U.S. program.

8. As of March 6, 1996, 26 of the newly affected nations (including ... seven Latin American nations) have responded in some fashion as to make possible at least an initial prediction as to the likelihood of their situation on May 1, 1996. I would summarize their responses as follows:

- 15 have indicated that they would not be able to have a comparable program in place by May 1, 1996.

- 7 have indicated that they would likely be able to have a comparable program in place by May 1, 1996, provided the U.S. Government can assist them.

- 3 claim either that they have no commercial shrimp trawl fishery or that no turtles occur where their commercial shrimp trawl fishery takes place.

- 1 claims already to have a comparable program.

The remaining nations—i.e., the large majority of the newly affected nations—have

not responded in a way that allows us to predict their future course on this matter. *Id.*, paras. 7, 8.

From this summary, Secretary Spero attempts to extrapolate the following points, among others:

— It is likely that many of the major shrimp exporting nations will be unable to implement a comparable program by May 1, 1996. *Id.*, para. 9.

— The defendants stand willing to assist nations in the adoption and implementation of comparable programs. *Id.*, para. 12.

— Widespread embargoes would cause substantial harm in at least three ways:

First, they could substantially impair the ability of the U.S. government to secure protection of sea turtles as envisioned in section 609.

Second, the embargoes would disrupt a vast quantity of international trade in shrimp.

Third, failure to postpone the deadline will cause serious and long-lasting harm to overall U.S. foreign policy interests, particularly to the promotion of liberalized trade through the progressive reduction of non-tariff barriers.[1]

On its part, the intervenor-defendant National Fisheries Institute, Inc. ("NFI") filed a declaration of its Vice President for Government Relations, Richard E. Gutting, Jr., which attempts to estimate the "impacts" of the court's decision on the supply of shrimp in the United States, to calculate losses to the U.S. seafood industry and the consuming public which could result from the imposition of embargoes on May 1, 1996, and to assess the likely consequences of the court's order for sea turtles in U.S. waters and abroad and for domestic shrimp fishers.

At first blush, the foregoing declarations were of sufficient moment to cause the court to convene immediately, at which hearing the defendants and intervenor-defendant were afforded an opportunity to present evidence in support thereof.[2] They did not. Little was added to the few facts already included in their scripted generalizations. Either they could not or would not answer rudimentary questions seemingly relevant thereto. For example, as quoted above, Secretary Spero implicates more than 100 nations, yet counsel refused to name even one at the hearing, or to provide any acceptable legal basis for such refusal. *See* Tr. at 28–29. In short, the hearing proved counterproductive. Then on April 4, 1996, the government presented the court with a pile of papers under cover of a declaration of the Department of State's Assistant Secretary for Oceans and International Environmental and Scientific Affairs ("OES") Eileen Claussen and upon the stated expectation that they "w[ould] be sufficient to warrant modification."[3] The Secretary claims to understand her task to be to provide "information deemed essential to decide defendants' motion for modification"[4] as follows:

a. For each and every country newly affected by section 609(b) of Pub.L. 101–162 ... evidence regarding the absolute amount of exports of aquaculture

---

1. Declaration of Joan E. Spero, paras. 14, 19, 21. *See also id.*, paras. 14 *passim*, 15, 16, 17, 18, 19 *passim*, 20, 22 and 23. Defendant Schmitten explains essentially how, as Director of the National Marine Fisheries Service ("NMFS"), he has been

delegated primary responsibility under the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, for implementation of that statute with respect to species of sea turtles listed as endangered or threatened, when they are in the marine environment. NMFS has also assisted the U.S. Department of State ... in that agency's implementation of section 609 of Public Law 101–162 by providing biological information on sea turtle distribution, and technical information and advice on fishing technologies, including the use of turtle exclu-

der devices (TEDs). NMFS has also engaged in various activities relating to transfer of TED technology to foreign countries.

2. And the court indicated that it was prepared to sit as long as necessary for such presentation. *See, e.g.,* transcript of hearing on March 26, 1996 ("Tr."), pp. 3, 57.

3. Supplemental Memorandum in Support of Defendants' Motion for Modification of December 29, 1995, Order, p. 2.

At the same time, the plaintiffs have brought forth additional papers of their own, which are referred to hereinafter.

4. Declaration of Eileen Claussen, para. 2, p. 2.

shrimp and wild caught shrimp for recent years, together with evidence regarding the amount of aquaculture shrimp as a percentage of all shrimp exports;

b. Evidence of the State Department's efforts since 1989 to disseminate information about ... TEDs[ ] and related technology worldwide;

c. Evidence regarding the State Department's efforts to negotiate and encourage TEDs use;

d. Evidence of the State Department's communications in 1991 to all nations regarding the use of TEDs, including a country-specific analysis of information exchanged and any State Department response to information received by each country;

e. Evidence supporting the need for extensions of time for those countries that primarily export aquaculture shrimp or harvest shrimp with technologies designed to preserve sea turtles (e.g. Thailand, Ecuador, and Australia);

f. Evidence regarding the ability of each nation newly affected by section 609 to comply with the statute, and evidence regarding the time each nation needs to come into compliance.

g. Evidence of the specific process for the transfer of TEDs technology.

h. Studies showing the amount of time it takes to prepare TEDs for use in each nation newly affected by the embargo.

i. Evidence regarding the reasons the May 1, 1996 deadline needs to be extended for Mexico.[5]

### B

The papers upon which the defendants (and the intervenor-defendant) now apparently rest are revealing, but they are also contradictory and/or unsupportive of the extraordinary relief requested.

That relief, of course, is a year's extension of time for all countries, yet Secretary Spero indicates, as quoted above, that at least eleven would not be affected by any embargo. Secretary Claussen now names Mexico, El Salvador, Guatemala, Colombia and Indonesia in this regard.[6] *Cf.* Second Supplemental Declaration of Richard E. Gutting, Jr., para. 3, p. 3:

> ... I have assumed that ... twelve certified nations will meet U.S. requirements and that they will not be embargoed on May 1, 1996. These nations provide approximately 15 to 20 percent of total U.S. shrimp imports.

Defendant Schmitten admits in his declaration, paragraph 2, page 2, that

> some countries have stated that they will adopt regulatory programs that will likely allow them to be certified by May 1, and many imported shrimp and shrimp products are produced by aquaculture and therefore will not be subject to an embargo[.]

Indeed, Mr. Gutting's "conservative" assumption is that "as much as 50% of all U.S. shrimp imports is harvested from aquaculture facilities and so would not be subject to embargo." *Id.,* para. 7, p. 6. Secretary Claussen apparently agrees.[7]

> ... [A]nd conservatively assuming that ... 1996 import levels would otherwise be similar to those in 1994, NFI estimates that the Court's December 29 order is likely to exclude about 30 percent of total U.S. shrimp imports, or about 180 to 190 million pounds of shrimp. This amount of shrimp had an import value in 1994 of approximately $800 to $900 million.

*Id.,* para. 8.

However significant these estimates, 15–to–20 percent or 50% or 30 percent does not

---

5. *Id. Cf.* Tr. *passim.*

6. *See id.,* para. 3f, p. 6.

7. *See id.,* paras. 3a, 3e. The Secretary does point out, however, that the shrimp import statistics compiled by the U.S. Department of Commerce are not collected in a manner that enables a breakdown indicating whether imports are from aquaculture or are wild harvested shrimp, either on a country-by-country basis or as a proportion of the total shrimp imports. *Id.,* para. 3a.

equal extension of time for 100% of the putative exporters to the United States for the coming statutory year, nor should they be so inflated given the law and the circumstances of this case. With regard to those countries, public Commerce Department data on shrimp imports in 1994 show Thailand in the lead in terms of both poundage and dollar value, namely, 178.107 million and 981.047 million, respectively.[8] And the world's public press reports that some 95 percent of those shrimp were the product of aquaculture [9], which the evidence in this case indicated, and the court thus found, does not endanger the sea turtles. Ergo, slip op. 95–208 only encompasses "shrimp or products of shrimp wherever harvested in the wild". 19 CIT at ——, 913 F.Supp. at 580. This means that approximately 90 percent of the shrimp shipped by the number two exporter to the United States, Ecuador, also is not implicated.[10] The Commerce Department data for that nation were 106.056 million pounds of shrimp valued at 455.096 million dollars. *See* 1995 Commerce Report at 46. And its government has informed this court that it

> has adopted conservation measures carefully tailored to the particular circumstances of species as they exist in Ecuador. With respect to sea turtles, Ecuador has undertaken a national preservation program and has participated in multilateral sea turtle conservation efforts.[11]

Not only is it claimed that Thailand and Ecuador are committed to conserving sea turtles while harvesting their shrimp, the U.S. Secretary of State "specifically recognize[d] the efforts of Mexico, ... which has indicated that its programs will apply equally to the Atlantic (Gulf of Mexico and Caribbean) and Pacific coasts", in his 1991 Certification to The Congress Under Section 609 of Public Law 101–162 Regarding the Incidental Capture of Sea Turtles in Commercial Shrimping Operations. According to both sides to this case, this prediction has now become reality.[12] And defendants' data show Mexico in third place in terms of both poundage and value for U.S. shrimp imports for the most recent reported year. *See* 1995 Commerce Report, p. 46. Combining such data for just Thailand, Ecuador and Mexico results in 334.739 million pounds worth 1.69 billion dollars or more than 53 percent of the total for the first category and 63 percent of the second for all countries. *Cf. id.*

In their 1995 papers in support of their motion for summary judgment, the defendants relied on (and repeated) the Secretary of State's 1991 certification that Mexico (and Nicaragua and Colombia) intended to apply sea turtle conservation efforts, including TED use, to their Pacific coasts.[13] The day after the hearing on March 26, 1996 at which the defendants refused to discuss any nation even arguably in need of an extension of time, the government of nearby El Salvador,

---

**8.** *See* U.S. Dep't of Commerce, Fisheries of the United States, 1994 [hereinafter cited as "1995 Commerce Report"], p. 46 (Aug. 1995).

**9.** *See, e.g., Turtles in the soup,* The Economist (U.S. ed. March 16, 1996), at 64. This article further reports that Thailand "seems happy to accept the American law" and that it has had a law of its own protecting turtles since 1957. *Id. See also Bangkok, Thailand,* AP Worldstream, March 8, 1996; *Thai Delegation to Defend 2.4 Billion Dollar Shrimp Business in U.S.,* Deutsche Presse–Agentur, March 8, 1996 (English); *Thailand Shrimps for Export are Farm–Raised,* Xinhua News Agency, March 11, 1996 (English); in NEXIS News Library, CURNWS file.

**10.** *See* Brief of *Amicus Curiae* the Government of Ecuador in Support of Defendants' and Defendant–Intervenor's Cross–Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, p. 4.

**11.** *Id.* at 3. *See, e.g., id.,* Exhibit A (Republica del Ecuador, Ministerio de Industrias Comercio, Integracion y Pesca, Subsecretaria de Recursos Pesqueros, Direccion General de Pesca, Instituto Nacional de Pesca, *Conservacion y Proteccion de las Tortugas Marinas en Aguas Ecuatorianas Continentales e Insulares. Informe Oficial* (1995)).

**12.** *See* Declaration of Eileen Claussen, paras. 3f, 3i; Declaration of Todd Steiner in Support of Plaintiffs' Memorandum in Opposition to the Government of El Salvador's Memorandum and Exhibit A thereto, which is claimed to be an English translation of an emergency NOM–EM–001–PESC–1996 of the Mexican federal government, effective April 1, 1996, requiring that TEDs be used by all Mexican vessels trawling for shrimp in the Pacific Ocean and Gulf of California.

**13.** *See, e.g.,* Federal Defendants' Reply Memorandum in Support of Motion for Summary Judgment, p. 19.

which lies only on the Pacific Ocean, interposed a motion for leave to appear herein as *amicus curiae* and to file a memorandum in support of defendants' motion for modification which has been granted. While the memorandum states [para. 5] that the

> Government of El Salvador has undertaken efforts which are consistent with the goals of the ESA, *i.e.*, the protection of endangered sea turtles. For example, the Government of El Salvador is currently experimenting with the use of TEDs to determine the feasibility of requiring their use. The Government of El Salvador is also preparing studies concerning the economic and other impacts of TEDs. Finally, the Government is currently considering proposals for laws and regulations and programs, which are similar to those implemented by the United States[,]

elsewhere it is pleaded that that government cannot implement such regulations and programs by May 1, 1996 [para. 3] and that a resultant embargo against imports of shrimp and shrimp products from El Salvador "will cause significant and irreparable economic harm" [para. 4].

This may be true,[14] although the defendants are not necessarily in agreement. *See* Declaration of Eileen Claussen, para. 3f ("El Salvador ... apparently will be able to comply by May 1, 1996"). The Central American Director of plaintiff Earth Island Institute's Sea Turtle Restoration Project claims that El Salvador has some 70 shrimping vessels, all on the Pacific, none with TEDs, and which ensnare approximately 21,000 sea turtles every year, about half of which expire [15], but he also asserts that in 1992 El Salvador's Secretaria del Medio Ambiente had developed a program to introduce TEDs on its trawlers in accordance with section 609, and he describes activities in 1991, 1992, 1993 and 1994 related thereto. *See* April 4, 1996 Vargas Declaration, paras. 4–7. His counsel complain that El Salvador, having known of this

U.S. statute for years, fails to explain why it has been unable to deploy TEDs by now on its 70–vessel fleet. *See* Plaintiffs' Memorandum in Opposition to the Government of El Salvador's Memorandum, p. 5. On their part, the defendants have just produced a copy of an "action request" from Secretary of State Baker to U.S. embassies around the world on June 14, 1991, informing them, among other instructions as to the significance of section 609:

> In the U.S., a TED costs about 250 dollars, installed in the net. Much of this cost is labor and TEDs produced and installed locally are sure to cost considerably less. Depending on the cost of materials and labor a locally built and installed TED should probably cost somewhere between 50 and 100 dollars. One TED fits in each net so a standard double-rigged trawl vessel would need two TEDs. A single TED lasts an average of two or three years and is estimated to average less than one percent of the operating cost of the vessel over the life of the TED.

And Secretary Claussen adds:

> NMFS indicates that a grid-style TED fully installed in a webbing extension properly equipped with flotation can be installed in a shrimp trawl in one to one-and-one-half hours by an experienced person. From scratch, that is, installing a grid TED in a net extension, cutting the flap, installing the funnel, equipping it with floats, and then inserting it into a trawl would take even an experienced TED maker or net maker a minimum of four hours.

Declaration of Eileen Claussen, para. 3h.

## C

Facts and circumstances such as the foregoing hardly favor modification of the annual deadline the U.S. Congress enacted in 1989. But El Salvador and other, understandably concerned countries of Central America, as

---

**14.** The 1995 Commerce Report shows imports of 6.729 million pounds of shrimp from El Salvador in 1994, valued at $23,167,000.

**15.** Declaration of Randall Arauz Vargas in Support of Plaintiffs' Memorandum in Opposition to the Government of El Salvador's Memorandum

[hereinafter cited as "April 4, 1996 Vargas Declaration"], para. 3. The declarant adds that, according to his research, more than 60,000 sea turtles are captured each year by 350 Central American vessels, all but 500 of those reptiles in the Pacific. *Id.*, para. 2.

well as elsewhere in the world [16], can rest assured that those of the "wider Caribbean" have been certified in compliance with section 609. Moreover, slip op. 95–208 took note of the fact that Trinidad and Tobago was not so certified last year, but that the May 1995 embargo of its shrimp and products from shrimp was soon lifted (in August). *See* 19 CIT at ——, 913 F.Supp. at 571–72 and n. 20. In other words, while the timing of the commencement of any embargo has been well-established, its duration depends on subsequent developments.

In requesting a one-year, around-the-world extension of time, defendants' motion appears to present a paradox. To the extent they now attempt to portray nations as genuinely "newly affected", their own declarations tend to belie compliance within the additional period for which they pray. For example, Secretary Spero claims three years were necessary for most of the "Wider Caribbean nations" to achieve affirmative certification [17], while defendant Schmitten states:

... NMFS believes that, given its experience in Latin America, establishing an adequate TED program for a country with little or no previous experience with TEDs would take a minimum of two years.

Declaration of Rolland A. Schmitten, para. 8, p. 6. In Mr. Gutting's view,

the task of equipping tens of thousands of shrimp trawl vessels around the world with U.S.-approved equipment would take considerable time and effort.... [T]o take India as an example, it would almost certainly take several years to enforce TED compliance by thousands of Indian vessels along India's 8000 kilometer coastline and within its vast 2 million square kilometer exclusive economic zone.

Second Supplemental Declaration of Richard E. Gutting, Jr., para. 6, p. 5.

On the other hand, defendant Schmitten also points to "substantial [NMFS] technical assistance to countries in Latin America for the past five years" [18], which Secretary

---

16. In her declaration, Secretary Spero refers to nations "newly affected" by slip op. 95–208. The defendants now share copies of the written notification of that decision sent by the State Department to more than 60 U.S. embassies and consulates on January 9, 1996, which was updated on February 8, 1996. They also share copies of communications in regard to those and other nations, the gists of a sampling of which upon expeditious reading appear to be as follows: Australia (requesting TED-compliance exemption due to geography and comparable turtle-conservation measures); Bangladesh (97% of exports from aquaculture; 3% alleged to be harvested in areas not frequented by sea turtles); Brazil (currently certified, but subsequent certification uncertain due to weak enforcement regime); Cameroon (U.S. receives no wild shrimp exports); Peoples Republic of China (inadequate information; apparent lack of concern regarding compliance); Colombia (necessary regulations in place; U.S. experts currently there to instruct and install TEDs; OES affirmative recommendation expected); Costa Rica (requests three-month delay in order to fully comply); Guatemala (regulation in place but expects to need more time to comply; has asked for U.S. assistance to meet deadline); Guyana (recertification recommended by OES); Honduras (compliance feasible by start of shrimp season on July 1; June certification review by OES requested); India (country-wide compliance estimated to take "several years"; inquiry as to possibility of certification for individual companies); Indonesia (comparable TED usage since 1982); Ivory Coast (unsup-

ported denials of existence of sea turtles in territorial waters; no turtle conservation plan in place); Japan (no intention of requiring TEDs or comparable protective methods by "fish" trawlers); Kenya (not currently shrimp exporter to U.S.); Madagascar (no exports of shrimp to the U.S.); Malaysia (turtle conservation regulations claimed to exist but expected to be inadequate; awaiting documentation); Nicaragua (certification recommended by OES); Pakistan (no TEDs or comparable system in place); Panama (regulations in place; certification likely); Peru (all exports from aquaculture); Philippines (all exports from aquaculture; certification forms being timely submitted); Seychelles (no wild-harvested shrimp); Singapore (shrimp by-catch of "fish" trawlers alleged not to endanger sea turtles; no scientific data have been made available); South Africa (compliance impossible by May 1, 1996); Spain (further inquiry regarding guidelines, but no indication of compliance); Sri Lanka (enforces program comparable to U.S.; methods harmful to turtles banned; awaiting scientific documentation); Taiwan (claims comparable methods but no production of documentation); Tanzania (no shrimp exports to U.S.); Venezuela (recertification recommended by OES); and Vietnam (no shrimp exports to U.S., but would like to begin).

17. Declaration of Joan E. Spero, para. 9, p. 7.

18. Declaration of Rolland A. Schmitten, para. 5, p. 3.

Claussen confirms[19] while further volunteering that

well before the enactment of section 609, the government of Indonesia requested instruction in the use of TEDs ... [and] participated in a TEDs training session in 1982[,20]

and that in June 1991

the State Department sent a cable to its embassies in Taiwan, Thailand, China, Australia, Indonesia, Malaysia, and the Philippines, asking them to approach their respective host governments to open a dialogue on the technical elements of a program for the protection of sea turtles using TEDs.

Declaration of Eileen Claussen, para. 3c, pp. 3–4. Perhaps this is why so many countries have been certified in compliance in the past and why it appears from the information presented that so many could be certified come May 1, 1996.

If, as Secretary Claussen points out, nations have been on notice of section 609, even before as well as after its formal enactment in 1989, then the presumed anticipation of Congress has been realized, and any additional extension of time for all countries, including those certifiable now, would be more than anomalous. *Cf. id.*, para. 3i.

The concerned governments of the world, including that of the United States which is responsible for enforcement of its Endangered Species Act, should not need to be reminded of the age-old import of sea turtles to their peoples and that the evidence in this case still indicates

more than 124,000 sea turtles drown annually due to shrimping by all other nations. This represents the death of more than 340 sea turtles every day when TEDs are not used.

19 CIT at ——, 913 F.Supp. at 568. And no amount of facile presentation in support of the motion for modification has yet subtracted from this expert estimate by plaintiff Steiner. In sum, on the record such as has been developed to date, any modification of the deadline established in Pub.L. No. 101–

162, § 609(b), 103 Stat. 988, 1037–38, 16 U.S.C. § 1537 note, must be made in Congress and not in court.

**D**

Of course, this case reaffirms the historical method of governance of the United States, which leaves relations with foreign sovereigns and between the two political branches of the national government essentially beyond the hale of the federal judiciary. Hence, part (a) of Congress's section 609 has been held nonjusticiable herein. *Compare Earth Island Institute v. Christopher*, 6 F.3d 648, 650 (9th Cir.1993), *and* this court's earlier slip op. 95–103, 19 CIT at ——, ——, 890 F.Supp. 1085, 1088 (1995), *with* 6 F.3d at 654–56 (Brunetti, J., dissenting in part). That part provides:

The Secretary of State, in consultation with the Secretary of Commerce, shall, with respect to those species of sea turtles the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987—

(1) initiate negotiations as soon as possible for the development of bilateral or multilateral agreements with other nations for the protection and conservation of such species of sea turtles;

(2) initiate negotiations as soon as possible with all foreign governments which are engaged in, or which have persons or companies engaged in, commercial fishing operations which, as determined by the Secretary of Commerce, may affect adversely such species of sea turtles, for the purpose of entering into bilateral and multilateral treaties with such countries to protect such species of sea turtles;

(3) encourage such other agreements to promote the purposes of this section with other nations for the protection of specific ocean and land regions which are of special significance to the health and stability of such species of sea turtles;

---

19. *See* Declaration of Eileen Claussen, para. 3b.

20. *Id.*, para. 3c, p. 4.

(4) initiate the amendment of any existing international treaty for the protection and conservation of such species of sea turtles to which the United States is a party in order to make such treaty consistent with the purposes and policies of this section; and

(5) provide to the Congress by not later than one year after the date of enactment of this section—

(A) a list of each nation which conducts commercial shrimp fishing operations within the geographic range of distribution of such sea turtles;

(B) a list of each nation which conducts commercial shrimp fishing operations which may affect adversely such species of sea turtles; and

(C) a full report on—

(i) the results of his efforts under this section; and

(ii) the status of measures taken by each nation listed pursuant to paragraph (A) or (B) to protect and conserve such sea turtles.

Certainly, this mandate to negotiate "as soon as possible" and to apprise Congress "not later than one year after the date of enactment" hardly bespeaks an additional annum of delay more than six years after that date. On the other hand, starting in 1991 ostensibly pursuant to part (b) of section 609, *supra*, the Department of State has taken the

opportunity, to stress once again, to the Congress and to other countries whose commercial shrimp fisheries may adversely affect sea turtles, its commitment to promoting, as a matter of policy, equivalent measures to protect sea turtles in other areas where sea turtles are taken incidental to commercial shrimp fishing operations[,]

to quote Secretary Spero's certification of April 27, 1994, which was repeated verbatim in her official communications to Congress on

April 30, 1993 and April 28, 1995.[21] All but identical precatory language is found in the earlier certifications of Secretary Eagleburger in 1991 and Under Secretary of State Zoellick on April 30, 1992.[22] Given defendants' motion at bar, those representations may have been nothing more than lip service.

E

Be those as they were, the court's slip op. 95–208 was expedited within the twelve-month, annual timeframe adopted by Congress so as to afford all sides affected as much time as possible to contemplate, if not realize, individuated compliance with the long-standing law on or before May 1, 1996. Defendants' motion has cut short the period of intended accommodation afforded by the court, but to no positive effect. Indeed, the inadequacy of this interruption causes the court to consider CIT Rule 11, which provides, in part:

(b) REPRESENTATION TO COURT.

By presenting to the court (whether by signing, filing, submitting, or later advocating) a . . . written motion, . . . an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

\* \* \* \* \* \*

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

---

21. *Compare* Defendants' Memorandum in Support of Their Motion for Summary Judgment and in Response to Plaintiffs' Motion for Summary Judgment, Exhibit 4, p. 2 *with* Exhibit 3, p. 3 *and* Exhibit 5, p. 3.

22. *See id.*, Exhibit 1, p. 2. and Exhibit 2, p. 3.

Clearly in the court's judgment, the defendants violated these expectations in the presentment of their motion for modification. In fact, it has engendered exactly the kind of confusion which the rule has been adopted to prevent. Whether the perception of impossibility the defendants attempt to perpetrate applies to foreign exporters or to themselves is not certain. Whichever, the governing law, the controlling facts and their expectable allegiances and duties are (or should be) clear enough to state that, but for the desirability of curtailing further litigation, this court would order the defendants to show cause why sanctions should not be imposed pursuant to CIT Rule 11(c).

## II

In expediting slip op. 95–208 for the benefit of all interests affected, the court's order of December 29, 1995 was clearly interlocutory, with entry of any final judgment contingent upon resulting exigencies. *See* 19 CIT at ——, 913 F.Supp. at 579–80 and n. 40. The intent of the court also was (and remains) to assist in achieving the most just conclusion possible under the circumstances.

As cited at the outset of this decision, the defendants and the intervenor-defendant have already docketed appeals. And the court is unable to conclude in the aftermath, of hearing their motion for modification that their real goal is, not more litigation. *Cf.* Weber, Crouse, Irvin & Iudicello, Delay and Denial—A Political History of Sea Turtles and Shrimp Fishing (April 1995). Indeed, while pursuing their appeals, the defendants and intervenor-defendant take the position that this court is not without authority to modify that part of slip op. 95–208 for which they seek appellate review. *See, e.g.,* Tr. at 5, 54. *Cf. id.* at 64–65; Plaintiffs' Memorandum in Opposition to the Government of El Salvador's Memorandum, pp. 2, 3. Whatever jurisdiction remains with this court[23], as discussed above it could not even consider grant of the extraordinary equitable relief requested in the absence of compelling evidence. But, if further judicial review is genuinely their intent, acceleration of entry of final judgment in this Court of International Trade could facilitate such process.

Having heard no objection at the hearing to this suggested advancement, the court necessarily must review and consider its earlier slip ops. 95–103, 19 CIT ——, 890 F.Supp. 1085 (1995), and 95–169, 19 CIT ——, 1995 WL 604708 (Oct. 12, 1995), as well as 95–208, issued herein. Initially, after this case had been recommenced here as a result of dismissal for lack of subject-matter jurisdiction in the U.S. District Court for the Northern District of California *sub nom. Earth Island Institute v. Baker*, 1992 WL 565222, 1992 U.S.Dist. LEXIS 8604 (Aug. 6, 1992), *aff'd,* 6 F.3d 648 (9th Cir.1993), which opinions held such jurisdiction to rest exclusively with this Court of International Trade under 28 U.S.C. § 1581(i)(3) and (4) except for plaintiffs' claim(s) therein pursuant to part (a) of section 609, *supra,* this court in slip op. 95–103 denied defendants' motion to dismiss all the named parties plaintiff (save the Georgia Fishermen's Association, Inc. ("GFA")) plus the Secretary of Commerce and the Assistant Administrator of the NMFS as parties defendant essentially on the ground of lack of standing to sue or be sued. Cross-motions for summary judgment thereafter led to slip op. 95–208, which sustained the standing of all the named plaintiffs except GFA, as well as that of defendants Brown and Schmitten, given the nature of the equitable relief required. The court declared that the defendants are not properly enforcing part (b) of section 609, *supra,* by restricting its mandate to the Gulf of Mexico—Caribbean Sea—western Atlantic Ocean but also that their approach under section 609(b)(2) is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2).[24]

---

**23.** *See, e.g.,* CIT Rule 62(c); *Hawaii Housing Authority v. Midkiff,* 463 U.S. 1323, 1324, 104 S.Ct. 7, 8, 77 L.Ed.2d 1426 (1983) (Rehnquist, J.), and cases cited therein.

**24.** In sustaining defendants' approach with regard to the comparability required by section 609(b)(2), the court is constrained by the insinuations of their papers just filed to remind all who trawl for shrimp in the wild that TEDs are not a judicial solution to the problem of endangered species of sea turtles' drowning in the nets. Slip op. 95–208 simply concludes that the plaintiffs

In view of the foregoing, the motion of the defendants and the intervenor-defendant for modification of slip op. 95–208 must be, and it hereby is, denied.[25] There being no other outstanding motions or applications, final judgment will now enter accordingly.

So ordered.

### JUDGMENT

This case having been duly submitted for decision; and the court, after due deliberation, having rendered decisions herein; Now, therefore, in conformity with said decisions, it is

ORDERED, ADJUDGED and DECREED that those part(s) of the cross-motions for summary judgment of the defendants and the intervenor-defendant which seek dismissal from this case (a) of The Georgia Fishermen's Association, Inc. as a party plaintiff and (b) of claims of the remaining parties plaintiff for relief from defendants' enforcement of Pub.L. No. 101–162, § 609, 103 Stat. 988, 1037–38, 16 U.S.C. § 1537 note, except for part (b) thereof, be, and they hereby are, granted, and that named plaintiff and those claims are hereby dismissed; and it is further

ORDERED, ADJUDGED and DECREED that plaintiffs' motion for summary judgment be, and it hereby is, denied, except as hereinafter ordered, adjudged or decreed; and it is further hereby

ORDERED, ADJUDGED and DECREED that the defendants are not properly enforcing Pub.L. No. 101–162, § 609(b), 103 Stat. 1038, 16 U.S.C. § 1537 note, by restricting its mandate to the Gulf of Mexico—Caribbean Sea—western Atlantic Ocean; and it is further

ORDERED that the defendants, and each of them and their officials, employees, servants, sureties and assigns hereby is and are directed to, prohibit not later than May 1, 1996 the importation of shrimp or products from shrimp wherever harvested in the wild with commercial fishing technology which may affect adversely those species of sea turtles the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987, 52 Fed. Reg. 24,244, except as provided in Pub.L. No. 101–162, § 609(b)(2), 103 Stat. 1038, 16 U.S.C. § 1537 note.

---

failed to prove that that approach by the U.S. government is contrary to law.

25. Counsel for the defendants and the intervenor-defendant have requested that, if modification were denied, the court stay its December 29 order pending appeal. If these request(s) imply that a stay entails a different analysis, this court is unaware of such a standard, and the movants have not even attempted to show otherwise. Thus, their requests for a stay must also be hereby denied.