EARTH ISLAND INSTITUTE, a California Nonprofit Corporation; Todd Steiner; The American Society for the Prevention of Cruelty to Animals, a New York Nonprofit Corporation; and The Humane Society of the United States, a Delaware Nonprofit Corporation, The Sierra Club, a California Nonprofit Corporation; and The Georgia Fishermen's Association, Inc., a Georgia Corporation, Plaintiffs,

v.

Warren CHRISTOPHER, Secretary of State; Robert E. Rubin, Secretary of Treasury; Elinor G. Constable, Assistant Secretary of State for the Bureau of Oceans, International Environmental, and Scientific Affairs; Michael Kantor, Secretary of Commerce; and Rolland A. Schmitten, Assistant Administrator for Fisheries, National Marine Fisheries Service, Defendants,

and

National Fisheries Institute, Inc., Intervenor–Defendant.

Slip Op. 96–165.

Court No. 94–06–00321.

United States Court of International Trade.

Oct. 8, 1996.

Legal Strategies Group, Joshua R. Floum, Emerville, CA, for plaintiffs.

Frank W. Hunger, Assistant Attorney General; Lois J. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Jeffrey M. Telep and Environment & Natural Resources Division, Eileen Sobeck and Christiana P. Perry, U.S. Department of Justice; and Office of the Legal Adviser, U.S. Department of State, David Balton, Office of General Counsel, National Oceanic and Atmospheric Administration, Jason Patlis, and Office of the Chief Counsel, U.S. Customs Service, Lou Brenner, Jr., of counsel, for defendants.

Garvey, Schubert & Barer, Eldon V.C. Greenberg, Washington, DC, for intervenor-defendant.

*Opinion & Order*

AQUILINO, Judge:

In the wake of the court's opinion of December 29, 1995 herein, 19 CIT ——, 913 F.Supp. 559, *appeals dismissed,* 86 F.3d 1178 (Fed.Cir.1996), and final judgment in accordance therewith and with subsequent slip op. 96–62, 20 CIT ——, 922 F.Supp. 616 (1996), the defendants have promulgated (and formally filed) Dep't of State, *Revised Notice of Guidelines for Determining Comparability of Foreign Programs for the Protection of Turtles in Shrimp Trawl Fishing Operations,* 61 Fed.Reg. 17,342 (April 19, 1996), and Dep't of State, *Bureau of Oceans and Int'l Environmental and Scientific Affairs; Certifications Pursuant to Section 609 of*

*Public Law 101–162,* 61 Fed.Reg. 24,998 (May 17, 1996).

Whereupon the plaintiffs returned to court with a motion to enforce the judgment on the grounds that these administrative responses are not in conformity with it and the underlying statute.[1] And a hearing was held.

### I

While much has been said and written to date in and about this case, the law at its core is quite succinct. In part (b)(1) of Pub.L. No. 101–162, § 609, 103 Stat. 988, 1038, 16 U.S.C. § 1537 note (1989), Congress has provided that the importation into the United States of shrimp or products from shrimp which have been harvested with commercial fishing technology which may affect adversely endangered species of sea turtles "shall be prohibited not later than May 1, 1991, except as provided in paragraph (2)", to wit:

(2) CERTIFICATION PROCEDURE.—The ban on importation of shrimp or products from shrimp pursuant to paragraph (1) shall not apply if the President shall determine and certify to the Congress not later than May 1, 1991, and annually thereafter that—

(A) the government of the harvesting nation has provided documentary evidence of the adoption of a regulatory program governing the incidental taking of such sea turtles in the course of such harvesting that is comparable to that of the United States; and

(B) the average rate of that incidental taking by the vessels of the harvesting nation is comparable to the average rate of incidental taking of sea turtles by United States vessels in the course of such harvesting; or

(C) the particular fishing environment of the harvesting nation does not pose a threat of the incidental taking of such sea turtles in the course of such harvesting.

And the court has concluded that this statute is unambiguous and therefore in its April 10, 1996 final judgment

ORDERED, ADJUDGED and DECREED that the defendants are not properly enforcing Pub.L. No. 101–162, § 609(b) ... by restricting its mandate to the Gulf of Mexico–Caribbean Sea—western Atlantic Ocean; and ... further

ORDERED that the defendants ... prohibit not later than May 1, 1996 the importation of shrimp or products from shrimp wherever harvested in the wild with commercial fishing technology which may affect adversely those species of sea turtles the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987, 52 Fed. Reg. 24,244, except as provided in Pub.L. No. 101–162, § 609(b)(2)....

The State Department's notice published on May 17, 1996 reports in part:

A December, 1995 U.S. Court of International Trade decision expanded the scope of Section 609 to include all countries which harvest shrimp. On April 30, 1996, the Department of State certified that 36 of the affected countries have met the requirements of the law. As a result, shrimp imports from all other countries harvested with commercial fishing technology which may adversely affect sea turtles were prohibited pursuant to Section 609 effective May 1, 1996. The ban on shrimp imports from Suriname (in effect since May 1, 1993) and French Guiana (in effect since May 1, 1992) remain in place.

The countries that were certified on April 30, 1996[ ] are Argentina, the Bahamas, Belgium, Belize, Brunei, Canada, Chile, Colombia, Costa Rica, Denmark, the Dominican Republic, Ecuador, El Salvador, Germany, Guatemala, Guyana, Haiti, Iceland, Indonesia, Ireland, Jamaica, Mexico, the Netherlands, New Zealand, Nicaragua, Norway, Oman, Panama, Peru, Russia, Sri Lanka, Sweden, Trinidad and Tobago, the United Kingdom, Uruguay and Venezuela.

---

**1.** The plaintiffs have also filed an application for award of attorneys' fees and expenses incurred in these proceedings.

Of these, the Department certified that the fishing environment in some countries does not pose a threat of the incidental taking of sea turtles protected by Section 609. The following 15 nations have shrimp fisheries only in cold waters where there is essentially no risk of taking sea turtles: Argentina, Belgium, Canada, Chile, Denmark, Germany, Iceland, Ireland, the Netherlands, New Zealand, Norway, Russia, Sweden, the United Kingdom, and Uruguay. The following 8 nations only harvest shrimp using manual rather than mechanical means to retrieve nets: the Bahamas, Brunei, the Dominican Republic, Haiti, Jamaica, Oman, Peru and Sri Lanka. Use of such small-scale technology does not adversely affect sea turtles.

The following countries were certified as having adopted programs to reduce the incidental capture of sea turtles in shrimp fisheries comparable to the program in effect in the United States: Belize, Colombia, Costa Rica, Ecuador, El Salvador, Guatemala, Guyana, Indonesia, Mexico, Nicaragua, Panama, Trinidad and Tobago, and Venezuela.

\*　　\*　　\*　　\*　　\*　　\*

As is clear from the revised guidelines issued by the Department of State on April 19, 1996, the implementation of the Court of International Trade's order has required certain procedural refinements. The Department will keep these guidelines under close review throughout the upcoming year to ensure the effective implementation of Section 609, and will carefully review their effectiveness and enforceability before making any 1997 certifications. It is the intention of the Department to promote the development of comprehensive TED programs in all harvesting nations where shrimp trawl fisheries pose a risk to sea turtles....

61 Fed.Reg. at 24,999.

## A

Plaintiffs' motion to enforce focuses on those revised guidelines issued on April 19, 1996, in particular that part of their preamble which announces that the

Department of State has determined that import prohibitions imposed pursuant to Section 609 do not apply to shrimp or products of shrimp harvested ... by commercial shrimp trawl vessels using TEDs comparable in effectiveness to those required in the United States.

\*　　\*　　\*　　\*　　\*　　\*

*Shrimp Exporter's Declaration.* The Department of State has determined that, in order to achieve effective implementation of Section 609 on a world-wide basis, beginning May 1, 1996, all shipments of shrimp and products of shrimp into the United States must be accompanied by a declaration (DSP–121, revised) attesting that the shrimp accompanying the declaration was harvested either under conditions that do not adversely affect sea turtles (as defined above) or in waters subject to the jurisdiction of a nation currently certified pursuant to Section 609. All declaration[s] must be signed by the exporter of the shrimp. A government official of the harvesting nation must also sign those declarations asserting that the accompanying shrimp was harvested under conditions that do not adversely affect sea turtles. The declaration must accompany the shipment through all states of the export process, including in the course of any transshipments and of any transformation of the original product.

61 Fed.Reg. at 17,343. The plaintiffs condemn this approach as "dangerous" and "disingenuous" because it

eliminates any incentive for countries to put TEDs on more than a handful of nets. Countries can evade the Law's embargo by exporting to the United States those shrimp caught by a few designated vessels which are equipped with TEDs, while exporting elsewhere shrimp caught by those which are not. This eviscerates *both* of Congress' purposes in enacting the Turtle Law. It fails to create the level playing field which Congress undeniably sought for the U.S. fleet, which is required to put TEDs on *each and every* vessel. It also guts the Law's objective of protecting these endangered species—for substantial portions of the shrimping fleets of export-

ing nations may now eschew TEDs with impunity.[2]

Whereupon they requested that the court compel the defendants to "embargo *all* wild-caught shrimp exports from countries which do not adopt a regulatory scheme requiring TEDs that is comparable to that of the United States." Plaintiffs' Memorandum, p. 3 (emphasis in original).

### B

While recognizing that the court's judgment "largely tracks the language of Section 609(b)(1)"[3] based upon a "conclusion that the law must be applied to all nations"[4], the defendants admit to substantial revision of the procedure and method for its implementation:

> ... While under the former guidelines, all shrimp harvested in the wild from nations not certified pursuant to Section 609(b)(2) was subject to embargo, the revised guidelines allow for the importation of shrimp and shrimp products (regardless of whether the nation in whose waters it is harvested has been certified) if the nation of origin has certified that the shrimp has been harvested in a manner that does not adversely affect sea turtles.[5]

They claim as the cause of this change "several practical issues in implementation resulting from the application of the Court's order to situations not previously encountered under the agency's former interpretation of Section 609."[6] The Acting Assistant Secretary of State for Oceans and International Environmental and Scientific Affairs identifies such "practical issues" to include consideration of all shrimp harvesting nations for certification, categories of shrimp for exemption from embargo, transshipment to the United States of foreign-harvested shrimp, and documentation to accompany all shrimp imports. According to the Secretary, another issue

confronted in recent months arises from the fact that Section 609 does not prohibit importation of *all* shrimp from nations that are not certified under Section 609(b)(2), but only of shrimp harvested with commercial fishing technology that may adversely affect species of sea turtles protected under U.S. law and regulations. In the years preceding the Court order, the Department was able to certify most of the nations of the Wider Caribbean Region under Section 609. Few embargoes were imposed and, because the few embargoed nations chose to sell their shrimp elsewhere, there was little need to develop a mechanism to permit continued entry from uncertified nations of shrimp that was not subject to the embargo (*i.e.*, shrimp that was not harvested with commercial fishing technology that may adversely affect these species of sea turtles).

Declaration of David A. Colson, para. 4 (emphasis in original). Defendants' argument in defense of this altered stance is that (a) the parties never briefed, and the court did not rule upon, whether shrimp harvested with TEDs may be exempted from embargo; (b) the State Department's decision to exempt shrimp harvested with TEDs is authorized by the clear language of section 609 as well as its purposes and policies; (c) the revised guidelines are consistent with the legislative history of section 609; and (d) the Department's guidelines foster, rather than undermine, the purposes of section 609(b).

The intervenor-defendant supports this position, arguing in addition that the TEDs exemption is consistent with relevant international trade considerations.

### C

After review of the written submissions on both sides, the court held the hearing on July 25, 1996 primarily for the receipt of evidence in support of or opposition to plaintiffs' mo-

---

**2.** Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Enforce Judgment, p. 3 (emphasis in original).

The acronym "TEDs" refers to various turtle excluder devices. *See generally* 19 CIT at —— and 913 F.Supp. at 563, n. 1 and references therein.

**3.** Defendants' Response, p. 8.

**4.** *Id.* at 6.

**5.** *Id.* at 1–2.

**6.** *Id.* at 2.

tion to enforce. None of the parties presented evidence [7], only oral argument. Hence, they rest on their conflicting interpretations of the law.

## II

The jurisdiction of the court to determine the effect of, and to enforce, its judgment is not at issue. *E.g., United States v. The Hanover Ins. Co.,* 18 CIT 991, 869 F.Supp. 950 (1994), *aff'd,* 82 F.3d 1052 (Fed.Cir.1996); *D & M Watch Corp. v. United States,* 16 CIT 285, 795 F.Supp. 1160 (1992).

## A

Also not placed at issue by either the defendants or the intervenor-defendant at this stage in these proceedings is that part of the court's judgment which declares the scope of section 609, *supra,* to be worldwide. As for plaintiffs' other major substantive claim, the judgment dismissed the part of their complaint left intact earlier by *Earth Island Institute v. Baker,* 1992 WL 565222 (N.D.Cal. Aug. 6, 1992), *aff'd,* 6 F.3d 648 (9th Cir.1993), and *Earth Island Institute v. Christopher,* 19 CIT ——, 890 F.Supp. 1085 (1995), and which contested defendants' approach to determination of (A) "the incidental taking of . . . sea turtles . . . that is comparable to that of the United States" and (B) "the average rate of that incidental taking by the vessels of the harvesting nation . . . comparable to the average rate of incidental taking of sea turtles by United States vessels in the course of such harvesting", to quote from

those lettered subsections of the statute, paragraph (2), *supra.* The court's December 29, 1995 opinion had concluded that that approach was not contrary to law. *See* 19 CIT at ——, 913 F.Supp. at 578–79. *See also* 20 CIT at —— and 922 F.Supp. at 626–27, n. 24 and accompanying text. In rendering such judgment on that claim, the court was nevertheless

> constrained by the insinuations of [defendants'] papers . . . to remind all who trawl for shrimp in the wild that TEDs are not a judicial solution to the problem of endangered species of sea turtles' drowning in the nets.

20 CIT at —— and 922 F.Supp. at 626, n. 24. That is, the Department of State's *Revised Guidelines for Determining Comparability of Foreign Programs for the Protection of Turtles in Shrimp Trawl Fishing Operations,* 58 Fed.Reg. 9,015, 9,016 (Feb. 18, 1993), reported that "all U.S. commercial shrimp trawl vessels in the waters of the Gulf of Mexico and the Atlantic Ocean from North Carolina to Texas must use TEDs at all times in all areas" and thereupon stated that, to receive a certification in 1994 and in subsequent years, "affected nations must require the use of TEDs on all of their shrimp trawl vessels." 58 Fed.Reg. at 9,017. Further:

> For 1994 and subsequent years, take rates will be deemed comparable if the affected nations require that all shrimp trawl vessels use TEDs at all times, subject to the exemptions provided in section I(A)(3). . . . [8]

> (a) Any vessel whose nets are retrieved exclusively by manual rather than mechanical means. This exemption is not available to any vessel on which any mechanical device is used to haul aboard any part of the net.
>
> (b) Any vessels which use exclusively the following specific gear: Barred-beam trawls or roller trawls, pusherhead trawls, wing nets, bait shrimpers and skimmer trawls. The definition of each of the above gear types is the same as that specified in U.S. domestic regulations.
>
> (c) Until December 1, 1994, any vessel operating in inshore waters (bays and estuaries) and pulling a single net with a headrope length of less than 35 feet (10.7m) and a footrope length of less than 44 feet (13.4m) may, as an alternative to using a TED, limit tow times to no more than 75 minutes. After December 1,

---

**7.** Upon plaintiffs' application at the hearing, both sides were afforded until September 30, 1996 to discover and/or present relevant facts. They have failed to do so, which the plaintiffs now confirm in a letter to the court dated September 20, 1996. To the extent this letter also seeks to moot this shortcoming by seeking to withdraw plaintiffs' motion to enforce, the request must be, and it hereby is, denied. *Cf. U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership,* —— U.S. ——, ——, 115 S.Ct. 386, 392, 130 L.Ed.2d 233 (1994) ("As always when federal courts contemplate equitable relief, our holding must also take account of the public interest").

**8.** 58 Fed.Reg. at 9,017. The exemptions referred to [we]re:

(3) . . . [T]he affected countries may allow exemptions to the required use of TEDs in the following cases:

And those countries deemed covered by section 609 by the State Department were certified prior to 1996 as in compliance if all their trawlers were required to use TEDs and as having comparable take rates if those TEDs were required to be used at all times. *See* 19 CIT at ——, 913 F.Supp. at 578.

### B

The current, revised guidelines now at bar reiterate that, with "very limited exceptions, all U.S. commercial shrimp trawl vessels . . . must use approved TEDs at all times and in all areas"[9], and they also appear to embrace the law of this case that section 609 applies to shrimp harvested in the wild in all foreign nations. *See* 61 Fed.Reg. at 17,343. Notwithstanding this continuing reference to "all foreign nations", it is plaintiffs' position that the revised guidelines "remove *all* incentive for any nation to implement a TEDs program, ever"[10], the "certification process becomes meaningless, and Congress' will is entirely undermined." Plaintiffs' Memorandum, p. 14, n. 9.

### (1)

Again, from this court's perspective, the constitutional, legislated will of Congress remains unambiguous upon reading and rereading its manifestation in section 609 of Pub.L. No. 101–162, 103 Stat. 988, 1037–38, 16 U.S.C. § 1537 note (1989). As stated, this statute is succinct and should be read in toto, notwithstanding the fact that enforcement of its part (a) has been held beyond the hale of the judiciary. *See Earth Island Institute v. Baker; Earth Island Institute v. Christopher, supra.* That part provides:

> The Secretary of State, in consultation with the Secretary of Commerce, shall, with respect to those species of sea turtles the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987—
>
> (1) initiate negotiations as soon as possible for the development of bilateral or multilateral agreements with other nations for the protection and conservation of such species of sea turtles;
>
> (2) initiate negotiations as soon as possible with all foreign governments which are engaged in, or which have persons or companies engaged in, commercial fishing operations which, as determined by the Secretary of Commerce, may affect adversely such species of sea turtles, for the purpose of entering into bilateral and multilateral treaties with such countries to protect such species of sea turtles;
>
> (3) encourage such other agreements to promote the purposes of this section with other nations for the protection of specific ocean and land regions which are of special significance to the health and stability of such species of sea turtles;
>
> (4) initiate the amendment of any existing international treaty for the protection and conservation of such species of sea turtles to which the United States is a party in order to make such treaty consistent with the purposes and policies of this section; and
>
> (5) provide to the Congress by not later than one year after the date of enactment of this section—
>
> (A) a list of each nation which conducts commercial shrimp fishing operations within the geographic range of distribution of such sea turtles;
>
> (B) a list of each nation which conducts commercial shrimp fishing operations which may affect adversely such species of sea turtles; and
>
> (C) a full report on—
>
> (i) the results of his efforts under this section; and
>
> (ii) the status of measures taken by each nation listed pursuant to paragraph (A) or (B) to protect and conserve such sea turtles.

Clearly, its focus is "other nations" and "each nation" and "all foreign governments which

---

9. 61 Fed.Reg. at 17,343, col. 1.

1994, affected nations must require the use of TEDs on all such vessels.

10. Plaintiffs' Memorandum, p. 13, n. 7 (emphasis in original).

are engaged in, or which have persons or companies engaged in, commercial fishing operations ...". Understandably, the focus is not primarily on such persons or companies (or the nets in use during their trawling). And the same must be said of part (b) of section 609, *supra*. Its principal focus is "harvesting nation". And this inter*national* focus has been well-understood by the U.S. government and reported upon in the annual certifications to Congress. *See* Defendants' Memorandum in Support of Their Motion for Summary Judgment and in Response to Plaintiffs' Motion for Summary Judgment, Exhibit 1 (1991), Exhibit 2 (1992), Exhibit 3 (1993), Exhibit 4 (1994), Exhibit 5 (1995). *See also* Declaration of David A. Colson, para. 2, p. 2 (July 1996):

> ... The Department of State now considers *all* shrimp harvesting nations for possible certification under that statute, not just the 14 nations in the Wider Caribbean Region that had previously been subject to the certification requirement. *All* shrimp harvesting nations that are not certified are, as of May 1, 1996, under an embargo on the importation of their shrimp and shrimp products, in accordance with Section 609(b)(1).

(Emphasis in original). *See also id.*, para. 11, p. 7. Indeed, there has been no showing that any such harvesting nations, including, for example, Ecuador and El Salvador which obtained leave to appear herein *amici curiae*, have comprehended section 609 differently. *Cf.* 20 CIT at —— and 922 F.Supp. at 623, n. 16 and accompanying text.

Nonetheless, if the court comprehends defendants' revised approach correctly, it is founded on the language of paragraph (1) of section 609(b), read alone, which prohibits importation of shrimp harvested "with commercial fishing technology which may affect adversely such species of sea turtles". But that paragraph is specifically contingent upon the certification procedure established by section 609(b)(2), which offers the only congressionally-approved breaches of the embargo, either via subparagraphs (A) and (B) or through (C).[11] Paragraphs (b)(1) and (b)(2) are *pari materia;* they cannot be read independently or out of the context adopted by Congress, including section 609(a), to slow or stanch the extinction of species of sea turtles.

Indeed, the defendants had not attempted otherwise prior to April of this year. They blame this litigation for their approach now. But the regime upon which it is based has governed them since May 1, 1991 and been part of the United States Code before then. Certainly, they have had ample opportunity to propose, if not realize, legislative amelioration of what is now clearly perceived to be a daunting remedy. Perhaps the reason this has not happened is that the harm the remedy attempts to allay has been equally well-understood, by both the President and the Congress.

(2)

■ This court has opined that section 609(b)(2) is subject to varying interpretations regarding comparability[12] and thus that the government has discretion in its enforcement. To date, as indicated above, the exercise of this discretion has been based, as required by the statute, on the regulatory program in place for U.S. shrimp trawlers, the essence of which is use of TEDs on all those vessels at all times. The defendants have not amended this program since entry of judgment herein[13], and nations without comparable regulations thus have not been certified. The plaintiffs claim defendants' revised approach undermines incentive for those countries to become certified, thereby eviscerating the goal of Congress in enacting section 609. In the absence of evidence on

---

11. According to the State Department's notice of May 17, 1996 quoted above, 13 nations have avoided embargo pursuant to section 609(b)(2)(A) and (B), with another 23 having been certified under subparagraph (C). *See* 61 Fed.Reg. at 24,999.

12. *See* 19 CIT at ——, 913 F.Supp. at 578–79.

13. *Cf.* Declaration of David A. Colson, para. 17, p. 10 (July 1996) ("TEDs, because of their remarkable effectiveness, are the principal focus of the U.S. program to reduce sea turtle mortality in shrimp fisheries").

the record to the contrary [14], the court cannot find otherwise.

Defense counsel's argument that the court "never ruled upon the issue of whether shrimp harvested with TEDs may be exempted from the embargo" [15] is off the mark. The law Congress chose to enact is a unity, requiring cohesive, comprehensive enforcement. The judgment is nothing more than judicial affirmation of this regime, subject to the facts and circumstances of this case which showed exercise of administrative discretion not at odds with the law's requirement of foreign comparability to the U.S. program. To the extent that domestic comparator is an underpinning of the court's judgment, and has not been modified by the defendants, it restrains their immediate attempt at foreign accommodation, if not circumvention. The record, such as it still is, supports a finding that the requirement of TEDs on all vessels of a harvesting nation at all times results in a satisfactory rate of incidental taking of endangered species of sea turtles. In the absence of intelligence to the contrary, it remains *a fortiori* that requiring anything less than is comparable to the U.S. program violates section 609 and the court's judgment.

The embargo for the purpose of saving endangered species is that of Congress, not of the court, which cannot finesse it for other purposes arguably reasonable. The same

---

**14.** The best the defendants have offered is Secretary Colson's declaration that:

> 19. The Department carefully considered the consequences of exempting shrimp caught with TEDs from the embargo. On one hand, we recognized the possibility that the exemption might cause foreign governments that had adopted nation-wide TEDs programs, or that were inclined to do so, to abolish, curtail or delay such programs. On the other hand, we realized that the exemption would give individual shrimp fishermen and shrimping companies whose governments that had not yet adopted a nation-wide TEDs program, or that were not inclined to do so, a strong incentive to use TEDs so that they could continue to export shrimp to the United States. If such shrimp fishermen and shrimping companies start using TEDs, they will save sea turtles that would otherwise have drowned in their trawl nets. They may also come to appreciate the value and cost-effectiveness of TEDs and might help us persuade their governments to adopt a nation-wide TEDs program.
>
> 20. We also decided to provide foreign governments with another incentive to adopt nation-wide TEDs programs. As discussed above, we instituted a new requirement of a declaration to accompany all shrimp imports. For shrimp imports from certified nations, only the shrimp exporter must sign the declaration. For shrimp imports from other nations, a government official must also sign each declaration, attesting to the veracity of the information contained therein. This imposes on foreign government officials a substantial burden, which the foreign government can remove only by adopting a nation-wide TEDs program comparable to the U.S. program.

> \* \* \* \* \* \*

> 23. Although few of the newly affected nations were eligible for certification on May 1, 1996, foreign governments ... have shown reasonably strong interest in acquiring TEDs technology and in developing nation-wide TEDs programs. ...

Of course, this may prove to be true over time. *But see* Defendants' Response, p. 18 ("the vast majority of the remaining nations of the world— including many of the largest exporters to the United States such as Thailand, India, the People's Republic of China, Bangladesh, the Philippines, Singapore, and Malaysia—have not enacted regulatory programs in response to worldwide application of section 609 despite the imposition of the embargoes"); NEXIS News Library, CURNWS File (*ASEAN Accuses U.S. of Violating WTO Rules*, Japan Economic Newswire, Sept. 22, 1996; *India to Take US to WTO on Shrimp Imports Ban*, Deutsche Presse–Agentur, May 21, 1996; *Thailand to File Complaint Over U.S. Wild Shrimp Ban*, Xinhua News Agency, May 3, 1996; *Thailand and ASEAN to Protest US Shrimp Ban at WTO*, Deutsche Presse–Agentur, April 30, 1996; Janssen, *Thai Sea Turtles Face Bleak Future*, Deutsche Presse–Agentur, April 30, 1996; *Shrimp: Ban Takes Effect Tomorrow; WTO Battle Looms*, Greenwire, April 20, 1996; *Thai Official Calls US Turtle Law Enforcement Unfair*, Xinhua News Agency, April 9, 1996; N.V. Rao, *India Plans to Challenge US Decision on Shrimp*, Journal of Commerce, March 27, 1996, p. A5; *Shrimp: ASEAN May Complain to WTO About US Import Ban*, Greenwire, March 20, 1996); Declaration of Eldon V.C. Greenberg, Exhibit C (*ASEANs Charge Impending U.S. Shrimp Ban Violates WTO; Hint at Case*, Inside U.S. Trade, March 22, 1996, p. 25); *U.S. Ruling on Possible Embargo of Some Shrimp is Attacked in WTO*, Daily Report for Executives, No. 54, March 20, 1996, p. A–15; Williams, *ASEAN Warns on US Shrimp Ban*, Financial Times, March 20, 1996, p. 4.

**15.** Defendants' Response, p. 8. *See also id.* at 3–4.

holds for the defendants.[16] Suffice it to repeat here that the "plain intent of Congress in enacting this statute was to halt and reverse the trend towards species extinction, whatever the costs." 19 CIT at ——, 913 F.Supp. at 576, quoting from *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184, 98 S.Ct. 2279, 2297, 57 L.Ed.2d 117 (1978).

### III

The statute underlying *Hill* was the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, which this court has held can, if not should, be read with section 609 in *pari materia. Earth Island Institute v. Christopher*, 19 CIT ——, ——, 890 F.Supp. 1085, 1092 (1995). Indeed, Congress chose to codify that section as a note to 16 U.S.C. § 1537 ("International cooperation").

The plaintiffs have filed an application for award of their attorneys' fees and expenses and costs pursuant to ESA, as well as to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, which statutes they claim are not mutually exclusive, citing *Thomas v. Peterson*, 841 F.2d 332 (9th Cir.1988), and *Defenders of Wildlife v. Administrator, Environmental Protection Agency*, 700 F.Supp. 1028 (D.Minn.1988). They seek fees from December 1991 to date in the total amount of $381,658.75, plus expenses and costs of their attorneys aggregating $19,781.52. In addition, plaintiff Earth Island Institute prays for an award of $160,500.00.

The defendants take the position that this application should be denied in its entirety. They contend that (a) the court lacks jurisdiction to award fees under ESA, (b) the plaintiffs are not entitled to award under EAJA because the government's position was substantially justified and special circumstances would make an award unjust, (c) the plaintiffs cannot receive fees for services rendered in connection with the antecedent litigation in the U.S. District Court and Court of Appeals in California, (d) the plaintiffs are not entitled to fees for work performed in other litigation, (e) any award should be reduced for hours spent on issues on which the government prevailed, (f) attorneys' hourly rates are capped by EAJA and (g) plaintiff Earth Island Institute's claim is "quite unorthodox"[17] and should not be granted.

### A

■ The court concurs with regard to the claim for Earth Island Institute in its own right. The instant application states (at page 21) that the claim is for time spent

> rendering expert and other assistance to the litigation effort that otherwise would have been contracted out by plaintiffs' counsel and charged to plaintiffs' account. Mr. Steiner is a recognized expert in the field of conservation biology, and rendered invaluable expert assistance to plaintiffs' counsel on a variety of scientific and regulatory issues.... The total Earth Island request is $160,500, which is derived from the value of Mr. Steiner's time as an expert consultant in the field of conservation biology, at $125 per hour, plus the value of paralegal and clerical services performed by Earth Island that otherwise would have been performed by plaintiffs' counsel's paralegal staff at an average rate of $85 per hour.... Earth Island is entitled to these fees on the same theory that permits plaintiffs to recover for time spent on a case by in-house lawyers: permitting plaintiffs to recover for work done in-house will encourage citizen suits because plaintiffs will better be able to afford the upfront investment in the litigation.

The accompanying declaration of Todd Steiner, who is also a party plaintiff, adds, among other points, that he is a staff member of Earth Island Institute, which is an exempt

---

**16.** While constrained to conclude that the implementation of defendants' stated desire to accommodate harvesting nations not yet certified under section 609 violates that statute and the final judgment herein, the court does not also conclude that their "new" requirement(s) *sub nom. Shrimp Exporter's Declaration*, 61 Fed.Reg. at 17,343, for individual shipments reflect abuse of discretion, only that that documentation is not enough to afford entry into the United States of shrimp and products from shrimp caught in the wild by citizens or vessels of such nations, as opposed to those of certified countries.

**17.** Federal Defendants' Opposition to Plaintiffs' Application for Attorneys' Fees [hereinafter cited as "Defendants' Fee Opposition"], p. 41.

organization within the meaning of 26 U.S.C. § 501(c)(3), and Director of its Sea Turtle Restoration Project; that the Institute was not and is not in a position to litigate this case itself or to pay substantial legal fees and so sought out counsel willing to serve *pro bono;* that, as lead plaintiffs, they acted as liaison between counsel and the other plaintiffs; that he has devoted approximately 15 percent of his time, totalling about 1,400 hours, rendering expert advice to plaintiffs' attorneys in this case [18]; that he has served as a paid consultant in other matters [19]; that he devoted approximately 200 additional hours to clerical or paralegal work in this case, which, had he not done so, would have been performed by legal assistants or junior associates in plaintiffs' law firms [20]; and that, in

> many ways, Earth Island has stepped in and done the government's job ... as it became apparent that the government lacked the initiative to promote TED use, enforce the Turtle Law, and monitor turtle mortality.[21]

This plaintiff closes with a representation that any amounts recovered herein would be used for monitoring and training "to ensure that the government does, in fact, implement the Turtle Law in conformance with this Court's Order and that as many nations as possible require TEDs on their vessels and avoid embargo." Declaration of Todd Steiner, para. 17.

The court does not have reason to doubt the sincerity or veracity of these representations, but it does doubt that the law fashioning the shifting of the financial burden of suing defendants which lose has developed to such a degree as to provide prevailing plaintiffs with cash for their own purposes, particularly where there was no claim for mone-

tary reward in their pleadings and which were otherwise purported to have been motivated *pro bono publico.* Indeed, neither side's papers refer the court to such development, which fact was confirmed by counsel during the hearing. If the matter is thus one of genuine first impression, the court relies on the general premise that statutes of the kind at bar do bestow fees upon parties, not attorneys. *See, e.g., Evans v. Jeff D.,* 475 U.S. 717, 731–33, 106 S.Ct. 1531, 1539–40, 89 L.Ed.2d 747, *reh'g denied,* 476 U.S. 1179, 106 S.Ct. 2909, 90 L.Ed.2d 995 (1986). But, it has been held

> clear that attorneys' fees must go to the attorneys rather than to the plaintiff. If they did not, a wrong would be perpetrated upon the government.

*United States ex rel. Virani v. Jerry M. Lewis Truck Parts & Equipment, Inc.,* 89 F.3d 574, 578 (9th Cir.1996). That is, "weighty authority demonstrates that the client himself is not entitled to keep the fees which are measured by and paid on account of the attorneys' services." *Id.* at 577. *Cf. Kay v. Ehrler,* 499 U.S. 432, 435–37, 111 S.Ct. 1435, 1436–38, 113 L.Ed.2d 486 (1991).

The statute in *Virani* was the False Claims Act, which provides for award of reasonable attorneys' fees and expenses to plaintiffs *qui tam,* 31 U.S.C. § 3730(d)(1) (1986), but this court does not consider the unusual relationship to the government thereunder to diminish the principles quoted from the opinion of the Ninth Circuit. On the other hand, if they were not conclusive herein, the principle that, "[w]hen fees are sought at the expense of a losing party in court, no amount of work, or the money claimed therefor, is too small to obviate explanation" [22] would apply. Here, of course, the base claim of $143,500

---

**18.** The tasks which allegedly consumed plaintiff Steiner's time are listed in paragraph 10 of his declaration.

**19.** Plaintiff Steiner asserts in paragraph 12 of his declaration that the $125 per hour he claims is based on his understanding that consultants with his training and experience charge between $100 and $250 in and around San Francisco.

**20.** Compensation for this time is requested "at the average rate charged for paralegals by the

Heller, Ehrman firm, or $85". Declaration of Todd Steiner, para. 13.

**21.** Declaration of Todd Steiner, para. 16, which lists activities of Earth Island Institute over the past four years which are seemingly relevant to this case.

**22.** *Bonanza Trucking Corp. v. United States,* 11 CIT 436, 443, 664 F.Supp. 1453, 1458 (1987).

for plaintiff Steiner [23] is not small, but requisite business recordation in regular course of the hours of the days from which such amount has been derived is not part of plaintiffs' application. Finally, there is also no showing that, if Earth Island Institute and Todd Steiner were in fact in expert support of their counsel, as opposed to merely intentionally-conspicuous parties to this litigation [24], they either expected to be (or have been) paid for that expertise by counsel. In the absence of that kind of actual attorneys' expense, there can be no court-ordered reimbursement. *Cf.* Bartell, *Taxation of Costs and Awards of Expenses in Federal Court,* 101 F.R.D. 553, 578 (1984) ("A party to litigation is not deemed a 'witness' and cannot recover witness fees or travel expenses in connection with discovery proceedings or trial").

## B

Notwithstanding that this kind of case seemingly attracts committed private attorneys general, who, like plaintiff Steiner, declare involvement for the good of the cause pleaded, the reports of such cases are replete with awards of attorneys' fees and expenses and costs to successful plaintiffs initially *pro bono. E.g., Conservation Law Foundation of New England, Inc. v. Sec'y of Interior,* 790 F.2d 965 (1st Cir.1986); *Stenson v. Blum,* 512 F.Supp. 680 (S.D.N.Y.), *aff'd,* 671 F.2d 493 (2d Cir.1981), *aff'd,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Rodriguez v. Taylor,* 569 F.2d 1231 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978); *Nat'l Wildlife Federation v. Hanson,* 859 F.2d 313 (4th Cir.1988); *Chemical Manufacturers Ass'n v. U.S. Environmental Protection Agency,* 885 F.2d 1276 (5th Cir.1989); *Louisville Black Police Officers Organ., Inc. v. City of Louisville,* 700 F.2d 268 (6th Cir.1983); *Johnson v. Lafayette Fire Fighters Assoc.,* 51 F.3d 726 (7th Cir.1995); *Defenders of Wildlife v. Administrator, EPA,* 700 F.Supp. 1028 (D.Minn. 1988); *Palila v. Hawaii Dep't of Land and Natural Resources,* 512 F.Supp. 1006

(D.Haw.1981); *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983); *Jean v. Nelson,* 863 F.2d 759 (11th Cir.1988), *aff'd,* 496 U.S. 154, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990); *Sierra Club v. Environmental Protection Agency,* 769 F.2d 796 (D.C.Cir.1985); *Anaya v. Sec'y of Health and Human Services,* 1993 WL 241433 (Ct.Fed.Cl. June 17, 1993).

Despite this plethora, the defendants contend that the court lacks jurisdiction to award fees under ESA "because plaintiffs' suit was not brought pursuant to that statute." Defendants' Fee Opposition, p. 9. More specifically, they object on the grounds that the plaintiffs never complied with the statutory notice prerequisite of ESA, 16 U.S.C. § 1540(g)(2), and that the plaintiffs cannot claim award of fees pursuant to 16 U.S.C. § 1540(g)(4) "merely because this Court read Section 609 *in pari materia* with the ESA." *Id.* The pertinent parts of that statute referred to are as follows:

> (4) The court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

16 U.S.C. § 1540(g)(4). And:

> (2)(A) No action may be commenced under subparagraph (1)(A) of this section—
>
>> (i) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation;

16 U.S.C. § 1540(g)(2)(A)(i). And:

> (g) Citizen suits
>
> (1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf—
>
>> (A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged

---

**23.** *See* Declaration of Todd Steiner, para. 12, p. 7.

**24.** *See, e.g.,* Earth Island Institute Sea Turtle Restoration Project, *President Clinton faces a simple choice on trade and the environment,* N.Y. Times, April 29, 1996, at A27.

to be in violation of any provision of this chapter or regulation issued under the authority thereof;

16 U.S.C. § 1540(g)(1)(A).

The defendants correctly point out that this kind of waiver of sovereign immunity to shift fees against the government must be strictly construed, citing for support *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983), among other actions, but their opposition at bar amounts to little more than advocating form over substance and disregard of the law already established by this case. That is, after having successfully moved to dismiss plaintiffs' complaint [25] first filed in the U.S. District Court for the Northern District of California, No. C–92–0832 JPV (Feb. 24, 1992), the defendants moved for similar relief before this court, which was denied in slip op. 95–103, 19 CIT ——, 890 F.Supp. 1085, familiarity with which should be expected by now. To the extent the defendants would disregard that decision, it can be recited anew herein, to wit:

> ... Not only do the plaintiffs rely on the APA in this ... action, they take the position that it is also subject to judicial review under the citizen-suits provision of the Endangered Species Act ("ESA"). Their premise is that section 609 is a part of that statute by dint of its adoption as a note to the codified ESA provision on international cooperation, 16 U.S.C. § 1537.

> The defendants counter that such placement does not mean that Congress amended ESA when it enacted section 609 and also that amendments by implication are disfavored, while the intervenor-defendant adds that location does not confer meaning and any inference regarding the substance of a provision must be founded upon more than its placement or labelling. The court

concurs, but this agreement is not dispositive, for it seems that section 609 does supplement ESA. Stated another way, neither conflicts with the other; they can, if not should, be read in *pari materia.* For example, ESA section 1537(b) provides that the Secretary of Commerce, acting through the Secretary of State, shall encourage (1) foreign countries to provide for the conservation of endangered species and (2) the entering into of bilateral or multilateral agreements with them to provide for such conservation, while section 609(a)(1), 16 U.S.C. § 1537 note, adds that the Secretary of State, in consultation with his counterpart at Commerce, pursue such agreements "as soon as possible" with regard to the endangered species of sea turtles. *Cf.* 16 U.S.C. § 1540(h), entitled "Coordination with other laws", including the Tariff Act of 1930, as amended.

As indicated, ESA is possessed of a provision for lawsuits brought by citizens against the sovereign, essentially 16 U.S.C. § 1540(g)(1), subject to conditions specified in subsections (2) and, to a lesser extent, (3). One is that no suit commence prior to expiration of 60 days after written notice of an alleged violation under the act has been given to the government. The defendants now claim refuge under this precondition, but none can be found in view of the specific notice plaintiffs Earth Island Institute and Steiner provided via service and filing of their complaint in February 1992 in the California district court, the first paragraph of which alleged failure by the defendant Secretary of State *et alia* "to comply with and implement the clear mandate and requirement" of ESA and section 609 cited as the codified note thereto "to protect and conserve sea turtles from harm associated with shrimp fishing".[26]

---

**25.** *See Earth Island Institute v. Baker,* 1992 WL 565222 (N.D.Cal. Aug. 6, 1992), *aff'd,* 6 F.3d 648 (9th Cir.1993).

**26.** 19 CIT at ——, 890 F.Supp. at 1091–92. Footnote 3 to this opinion further states:

> Section 1540 also provides for jurisdiction in the district courts which, no doubt, led to commencement of the action in San Francisco

first. As recited, the district court and then the court of appeals there held that jurisdiction over the pleaded subject matter is exclusively within this national Court of International Trade. *Compare Earth Island Institute v. Christopher,* 6 F.3d 648 (9th Cir.1993), *passim with* 16 U.S.C. § 1540(c) and (g)(1) *and* 28 U.S.C. § 451. *See also Northwest Resource Information Center, Inc. v. Nat'l Marine Fisher-*

## C

It is sharp practice for counsel to repeat even now before this court that plaintiffs' district-court complaint, which was served on the Secretaries of State and Commerce *et alia* more than 800 days before this case commenced, the gravamen of which has remained the same and prays for the preservation of endangered species within the purview of ESA, fails to satisfy the 60–day written-notice requirement of section 1540(g)(2)(A)(i), *supra*. It is equally disingenuous for the government to continue to attempt to pretend that section 609 belongs to a part of the United States Code other than the Endangered Species Act, for which Congress opted. *See, e.g.,* 103 Stat. at 1037. *Cf. Trans–Border Customs Service, Inc. v. United States,* 76 F.3d 354, 356 (Fed.Cir. 1996) ("notes . . . apply to the interpretation and application of the various [statutory] . . . provisions").

This is not the first occurrence of such practice in this case. In entering final judgment herein, following defendants' recent unfounded attempt more than six years after enactment of section 609 to extend the deadline established by Congress yet another annum, the court was restrained by the desirability of curtailing further litigation from ordering them to show cause why sanctions should not be imposed pursuant to CIT Rule 11(c). *See* 20 CIT at ——, 922 F.Supp. at 626. Alas, this litigation continues, post final judgment, with defendants' having opted to attempt to stretch section 609 still longer.

Such conduct by the defendants, given the clarity of the act of Congress at issue and

settled practices when in court, hardly can be equated with the "substantiality justified" provision of EAJA, 28 U.S.C. § 2412(d)(1)(A). That standard for government avoidance of award of attorneys' fees and expenses is not in ESA, which the court concludes governs plaintiffs' application, only that any award be "reasonable".

In his declaration, plaintiffs' lead attorney has produced copies of records showing involvement in this matter from December 1991 to date. For most of that period, he was a member of the San Francisco law firm Heller, Ehrman, White & McAuliffe. On March 1, 1996, Mr. Floum joined Legal Strategies Group, "a law firm located in the San Francisco bay area city of Emeryville, California." [27] He posits an hourly rate of $280 for his work, with lesser rates for his lawyer associates and assistants. According to papers submitted, those rates resulted in a total of $120,295.44, including related expenses, as the price of proceedings in the Ninth Circuit, and in $250,109.54 and $52,-160.11 for Heller, Ehrman and Legal Strategies, respectively, before this court.

### (1)

Defendants' review of plaintiffs' submissions has caused them to argue that their adversaries are not entitled to fees for work performed on other litigation. The court, of course, concurs. And it is now in receipt of an offer to strike the contested $19,691.25 from plaintiffs' application "in the interest of being conservative" [28] which is hereby accepted to the extent of $15,125 in fees and $120 in cost.

---

ies Service, 25 F.3d 872, 875 (9th Cir.1994) (ESA an act of "general character governing citizens suits" which does not take precedence over more-explicit jurisdictional enactments). *Cf. Village of Kaktovik v. Watt,* 689 F.2d 222, 231–32 n. 76 (D.C.Cir.1982).

19 CIT at ——, 890 F.Supp. at 1092.

**27.** Declaration of Joshua R. Floum in Support of Plaintiffs' Application for Attorneys' Fees, Costs and Expenses [hereinafter cited as "Floum Declaration"], para. 2.

**28.** Declaration of Heather A. Young in Support of Plaintiffs' Motion to Enforce Judgment [here-

inafter cited as "Young Declaration"], para. 6. There are indications that this declarant is licensed to practice law elsewhere, but her name is not on the roll of the Bar of this Court of International Trade, which it should have been before any meaningful appearance was attempted here. Since such license, which signifies familiarity with the rules of practice and of the well-settled reasons therefor, is lacking, any award to the plaintiffs for this declarant's assistance in court beyond that of a paralegal must be, and it hereby is, denied.

As stated above, the defendants extend this argument to the antecedent proceedings in the Ninth Circuit, the final result of which was to dismiss the plaintiffs. The issue thus joined is whether those proceedings amounted to "other litigation" and, if not, whether there can be an award for time spent by plaintiffs' attorneys on questions raised by them but won by the defendants there or here.

■ The court's conclusion is in the negative on the first question and in the positive on the second. That is, an award is appropriate where a plaintiff has prevailed on the merits, which the defendants at bar concede, at least in part[29], as they must, and contributes to the goals of ESA in doing so. See, e.g., Ruckelshaus v. Sierra Club, supra; Abramowitz v. U.S. Environmental Protection Agency, 832 F.2d 1071 (9th Cir.1987); Oregon Natural Resource Council v. Turner, 863 F.Supp. 1277 (D.Or.1994).

Clearly, the plaintiffs at bar have served the public interest by assisting in the interpretation and implementation of section 609. And that assistance began in the district court and then the Ninth Circuit, which established that the statute is justiciable, in part, and also that this court has exclusive subject-matter jurisdiction over claims pursuant to section 609(b). That plaintiffs' action there was not formally transferred here does not mean that it could not have been[30] or, more importantly, that the proceedings have not been a continuum from the beginning. Moreover, that the defendants have prevailed on issues raised herein should not be automatically dispositive, given their difficulty and also the presumption of regularity which attaches to sovereign acts in general.

In Hensley v. Eckerhart, 461 U.S. 424, 440, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983), the Supreme Court has held that, where

a lawsuit consists of related claims, a plaintiff who has won substantial relief should

not have his attorney's fees reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

The Court defined unrelated claims as those "based on different facts and legal theories." 461 U.S. at 434, 103 S.Ct. at 1940. See, e.g., Conservation Law Foundation v. Sec'y of the Interior, 790 F.2d 965 (1st Cir.1986):

... [T]he question becomes whether ... the losing claims included a "common core of facts," or were "based on related legal theories," linking them to the successful claim. In the latter event, the award may include compensation for legal work performed on the unsuccessful claims.

790 F.2d at 970, quoting Garrity v. Sununu, 752 F.2d 727, 734 (1st Cir.1984).

■ The record in this case shows plaintiffs' claims to have a common core of facts and to be based on the now-proven premise that Congress, in enacting ESA, intended unequivocally that animal species be protected from extinction, including sea turtles, the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987. And Congress also contemplated citizen lawsuits as a means of enforcement of the statute, with the reasonable costs thereof recoverable whenever appropriate:

... Quite obviously, the legislature, when it called for citizen-suits, considered a fee recovery to be consonant with the public interest whenever the underlying suit was a prudent and desirable effort to achieve an unfulfilled objective of the [Clean Air] Act. The attorneys' fee feature was offered as an inducement to citizen-suits, which Congress deemed necessary; and if the hope Congress had for such suits is to become a reality, decisions o[n] fee allowance cannot make whole-sale substitutions

---

29. See Defendants' Fee Opposition, p. 2 ("we do not contest the plaintiffs' assertion that they are the 'prevailing parties' on a significant aspect of this litigation") (footnote omitted).

30. Cf. 28 U.S.C. § 1631; 19 CIT at ——, 913 F.Supp. at 573.

of hindsight for the legitimate expectations of citizen plaintiffs.[31]

This case does not warrant any attempt at such substitution, nor does it lend itself to severance of the issues adjudicated affirmatively from those in the negative for the plaintiffs, except for the dismissal from the case of The Georgia Fishermen's Association, Inc. In short, the court concludes that it is appropriate to award all the other parties plaintiff reasonable attorneys' fees and expenses for their effort as a whole, beginning in the district court.

(2)

In *Davis v. City and County of San Francisco*, 976 F.2d 1536 (1992), *reh'g denied*, 984 F.2d 345 (9th Cir.1993), the court pointed out that

[r]easonable fees are thus "to be calculated according to the prevailing market rates in the relevant community," ... with close attention paid to the fees charged by "lawyers of reasonably comparable skill, experience and reputation."

976 F.2d at 1545–46, quoting *Blum v. Stenson*, 465 U.S. at 895 and n. 11, 104 S.Ct. at 1547 and n. 11. Before the court in this regard is a declaration of a member of the San Francisco firm Altshuler, Berzon, Nussbaum, Berzon & Rubin, which professes specialization in both environmental law and federal-court attorney-fees litigation, among other areas. He opines

that the hourly rates charged by plaintiffs' counsel for their services are comparable to the market rate charged for work done on similarly complex litigation by attorneys of similar skill, experience and reputation; that the number of hours billed is reasonable in light of the complexity of the legal and factual issues in the case; and that the aggregate fees charged are reasonable given the above as well as the quality of work performed by plaintiffs' counsel and the results produced.

Declaration of Michael Rubin, para. 4. The basis of this opinion is thoroughly delineated with regard to the hourly rates for plaintiffs' lawyers [32], the total hours spent [33], the quality of the work performed [34], and the result achieved. *See id.*, paras. 12–14. A declaration submitted by a member of another San Francisco law firm, Landels, Ripley & Diamond, who claims to have been lead attorney in more than 50 public-interest environmental cases, is to the same effect, *e.g.*:

7. ... In my professional opinion, plaintiffs' counsel's work represents a high standard of professional excellence, demonstrates exemplary advocacy, and achieved an important result vindicating the public interest.

8. I have known Joshua R. Floum for over a year, have worked with him as co-counsel on a case, and am familiar with his reputation in the environmental legal community. Mr. Floum has a well-deserved reputation as an outstanding environmental litigator and his excellent work in this case exemplifies the high standards that he sets. I am convinced that his leadership and talent was [*sic*] a primary cause of the litigation results.

9. ... In my opinion, the result achieved in this litigation is one of the most significant legal victories ever achieved for protecting sea turtles throughout the world....

10. Based on my experience in public interest environmental litigation, I believe that these results would not have been possible without experienced counsel with significant expertise in this kind of envi-

---

**31.** *Sierra Club v. Gorsuch*, 672 F.2d 33, 36–37 (D.C.Cir.1982), *rev'd on another ground*, 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983), citing *Metropolitan Washington Coalition for Clean Air v. The District of Columbia*, 639 F.2d 802, 804 (D.C.Cir.1981).

The court notes in passing that the provision in the Clean Air Act for award of attorneys' fees, 42 U.S.C. § 7607(f), parallels that of ESA.

**32.** *See* Declaration of Michael Rubin, paras. 5–8. Those rates range from the $280 for lead counsel Floum down to $110 for a recent law school graduate who worked on the case. *See id.*, para. 5.

**33.** *See* Declaration of Michael Rubin, paras. 9 and 10.

**34.** *See id.*, para. 11.

ronmental litigation. Challenging federal agency decision-making is, even under ordinary circumstances, an uphill battle. When an agency decision involves regulatory and technical matters such as those present here, that task becomes even more daunting. Success under these circumstances is largely dependent on counsel possessing or acquiring highly specialized skills and knowledge. In this case it is clear that Mr. Floum and his colleagues effectively used a high degree of expertise regarding the Endangered Species Act and Section 609(b), as well as the complex regulatory structure by which they are implemented. . . .

Declaration of Paul P. Spaulding, III, paras. 7–10. This court has no basis to find otherwise.

(3)

As already indicated in part III–A above, any award of the kind for which the plaintiffs pray must be based on sound evidence. *See, e.g., Bonanza Trucking Corp. v. United States,* 11 CIT 436, 664 F.Supp. 1453 (1987); *Marbled Murrelet v. Pacific Lumber Co.,* 163 F.R.D. 308 (N.D.Cal.1995). And,

"[t]he party opposing the fee application has a burden of rebuttal that requires submission of evidence to the . . . court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." . . . The court may reduce the applicant's hours where documentation of the hours is inadequate, if the case was over-staffed and hours were duplicative, and if the hours expended were unnecessary or excessive.

*Id.,* 163 F.R.D. at 321, quoting *Gates v. Deukmejian,* 987 F.2d 1392, 1397 (9th Cir. 1992), and citing *Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1210 (1986), *reh'g denied,* 808 F.2d 1373 (9th Cir.1987).

As revealed in Mr. Floum's declaration and indicated above, the lion's share of time and expenses in this case belonged to Heller, Ehrman, White & McAuliffe. According to his reckoning, the case while in California incurred a total of $120,295.44 and another $250,109.54 here. Page 41 of exhibit B to the declaration contains a "Timekeeper Summary" of the firm's lawyers on the case, including, in alphabetical order, the following for whom award is still sought:

| Name | Total Hours | Avg. Rate | Listed Amount |
| --- | --- | --- | --- |
| E.A. Eggers | 42.25 | 120.00 | $ 5,070 |
| J.R. Floum | 321.00 | 276.64 | 88,800 |
| S.A. Quast | 88.25 | 205.00 | 18,091 |
| D.A. Sivas | 6.00 | 218.33 | 1,310 |
| N.J. Walthall | 654.25 | 147.87 | 96,745 |
| J.J. Williams | 34.75 | 198.85 | 6,910 |

The court has reviewed the first 31 pages of exhibit B, which appear to constitute a printout of the foregoing lawyers' billing notes, plus those of paralegals discussed hereinafter. Though hardly paragons of revelation, the court finds the notes sufficient to support an award of $213,596 to the plaintiffs for the time their Heller, Ehrman attorney authors attributed to the case before this court.[35]

Exhibit A to Mr. Floum's declaration, which apparently reflects activity attributable to Heller, Ehrman during the pendency of the case in California, is even less revealing than the processed pages of exhibit B. Besides the entries on this exhibit A stricken voluntarily by the declarant, the court strikes

---

**35.** Mr. Floum states in paragraph 6 of his declaration that he "wrote off entirely the time-entries for a number of timekeepers". The court, in making this award, has been constrained to strike also the following entries, which it is unable either to decipher adequately or otherwise to approve:

| Date | Name | Listed Amount |
| --- | --- | --- |
| 5/4/94 | J.R. Floum | $132.50 |
| 5/9/94 | J.R. Floum | 265.00 |
| 5/17/94 | J.R. Floum | 132.50 |
| 5/19/94 | J.R. Floum | 132.50 |
| 6/29/94 | J.R. Floum | 265.00 |
| 7/21/94 | J.R. Floum | 132.50 |
| 7/21/94 | N.J. Walthall | 162.50 |
| 7/26/94 | J.R. Floum | 132.50 |
| 7/26/94 | N.J. Walthall | 32.50 |
| 8/9/94 | J.R. Floum | 132.50 |
| 11/21/94 | J.R. Floum | 265.00 |
| 11/22/94 | J.R. Floum | 265.00 |
| 3/4/95 | N.J. Walthall | 560.00 |
| 3/5/95 | N.J. Walthall | 160.00 |
| 5/4/95 | J.R. Floum | 560.00 |

**614**

the following as inadequate and without other record support:

| Date | Name | Listed Amount |
| --- | --- | --- |
| 2/24/92 | [Gunther] | $ 675.00 |
| 3/3/92 | [Gunther] | 56.25 |
| 3/17/92 | [Gunther] | 225.00 |
| 3/24/92 | D.A. Sivas | 205.00 |
| 3/25/92 | D.A. Sivas | 205.00 |
| 3/27/92 | D.A. Sivas | 410.00 |
| 4/1/92 | [Gunther] | 450.00 |
| 4/1/92 | J.R. Floum | 235.00 |
| 4/8/92 | J.R. Floum | 58.75 |
| 5/7/92 | [Gunther] | 112.50 |
| 5/19/92 | J.R. Floum | 117.50 |
| 5/29/92 | [Rusineck] | 77.50 |
| 6/1/92 | [Rusineck] | 155.00 |
| 6/2/92 | [Rusineck] | 310.00 |
| 6/3/92 | [Rusineck] | 155.00 |
| 6/4/92 | [Rusineck] | 193.75 |
| 6/5/92 | [Rusineck] | 116.25 |
| 6/7/92 | [Rusineck] | 465.00 |
| 6/8/92 | [Rusineck] | 1,472.50 |
| 6/9/92 | J.R. Floum | 117.50 |
| 6/10/92 | [Rusineck] | 1,240.00 |
| 6/11/92 | [Rusineck] | 1,550.00 |
| 6/19/92 | [Rusineck] | 620.00 |
| 6/19/92 | [Gunther] | 281.25 |
| 6/22/92 | [Rusineck] | 387.50 |
| 6/23/92 | [Rusineck] | 620.00 |
| 6/23/92 | [Gunther] | 112.50 |
| 6/24/92 | [Rusineck] | 310.00 |
| 6/24/92 | J.R. Floum | 117.50 |
| 6/25/92 | [Rusineck] | 1,007.50 |
| 6/29/92 | [Rusineck] | 1,705.00 |
| 6/29/92 | [Gunther] | 618.75 |
| 6/30/92 | [Rusineck] | 1,085.00 |
| 7/1/92 | [Rusineck] | 465.00 |
| 7/2/92 | [Rusineck] | 775.00 |
| 7/6/92 | [Rusineck] | 116.25 |
| 7/13/92 | [Rusineck] | 271.25 |
| 7/14/92 | [Rusineck] | 155.00 |
| 7/15/92 | [Rusineck] | 155.00 |
| 7/16/92 | [Rusineck] | 542.50 |
| 7/24/92 | J.R. Floum | 235.00 |
| 7/24/92 | [Gunther] | 337.50 |
| 7/24/92 | [Rusineck] | 387.50 |
| 7/27/92 | [Rusineck] | 77.50 |
| 8/20/92 | [Gunther] | 112.50 |
| 8/20/92 | [Rusineck] | 77.50 |
| 8/27/92 | [Rusineck] | 155.00 |
| 8/28/92 | [Rusineck] | 155.00 |
| 9/3/92 | [Rusineck] | 116.25 |
| 9/4/92 | [Rusineck] | 77.50 |
| 9/14/92 | [Rusineck] | 542.50 |
| 9/16/92 | [Rusineck] | 77.50 |
| 9/21/92 | [Rusineck] | 310.00 |
| 9/22/92 | [Rusineck] | 232.50 |
| 9/24/92 | [Gunther] | 281.25 |
| 9/24/92 | [Rusineck] | 310.00 |
| 9/25/92 | [Gunther] | 225.00 |
| 9/25/92 | [Rusineck] | 155.00 |
| 9/28/92 | [Gunther] | 168.75 |
| 9/28/92 | [Rusineck] | 930.00 |
| 9/29/92 | [Rusineck] | 387.50 |
| 9/30/92 | [Rusineck] | 697.50 |
| 10/1/92 | [Gunther] | 225.00 |
| 10/1/92 | [Rusineck] | 775.00 |
| 10/2/92 | [Gunther] | 450.00 |
| 10/2/92 | [Rusineck] | 620.00 |
| 10/3/92 | [Gunther] | 1,125.00 |
| 10/5/92 | [Rusineck] | 310.00 |
| 10/6/92 | [Gunther] | 112.50 |
| 10/9/92 | [Gunther] | 393.75 |
| 10/9/92 | [Rusineck] | 232.50 |
| 10/13/92 | [Gunther] | 900.00 |
| 10/14/92 | [Gunther] | 1,800.00 |
| 10/21/92 | [Gunther] | 225.00 |
| 11/9/92 | [Gunther] | 225.00 |
| 11/10/92 | [Gunther] | 562.50 |
| 11/11/92 | [Gunther] | 56.25 |
| 11/15/92 | [Gunther] | 112.50 |
| 11/17/92 | [Gunther] | 225.00 |
| 11/18/92 | [Rusineck] | 77.50 |
| 11/19/92 | [Rusineck] | 232.50 |
| 11/20/92 | D.A. Sivas | 512.50 |
| 11/23/92 | [Gunther] | 112.50 |
| 11/30/92 | [Gunther] | 112.50 |
| 12/4/92 | [Gunther] | 112.50 |
| 12/14/92 | [Rusineck] | 542.50 |
| 12/15/92 | [Rusineck] | 310.00 |
| 12/16/92 | [Rusineck] | 465.00 |
| 12/17/92 | [Rusineck] | 155.00 |
| 12/18/92 | [Rusineck] | 465.00 |
| 12/21/92 | [Rusineck] | 930.00 |
| 12/28/92 | [Gunther] | 337.50 |
| 1/7/93 | [Rusineck] | 175.00 |
| 1/11/93 | [Rusineck] | 612.50 |
| 1/12/93 | [Rusineck] | 875.00 |
| 1/13/93 | [Rusineck] | 700.00 |
| 1/14/93 | [Rusineck] | 437.50 |
| 1/19/93 | [Rusineck] | 175.00 |
| 1/25/93 | [Gunther] | 117.50 |
| 2/2/93 | D.A. Sivas | 645.00 |
| 2/12/93 | D.A. Sivas | 537.50 |
| 4/30/93 | D.A. Sivas | 1,182.50 |
| 4/30/93 | [Gunther] | 587.50 |
| 6/14/93 | D.A. Sivas | 53.75 |
| 9/30/93 | [Gunther] | 117.50 |

Whereupon the court concludes that an award of $70,893.75 is appropriate and reasonable for work performed by Heller, Ehrman lawyers on this matter while in the California courts.

Exhibit C to Mr. Floum's declaration, which reflects services rendered by his current firm, Legal Strategies Group, for the plaintiffs from March 1 through May 8, 1996, is in better order. It sets forth 90.7 hours of activity by the declarant during that period, for which the court can and hereby does award $25,396, as well as 59.9 hours on behalf of Heather A. Young, who is discussed further hereinafter.

As indicated in part III–C(1), *supra*, the court is in receipt of a declaration of Ms.

Young in support of plaintiffs' motion to enforce the judgment. It claims that Mr. Floum spent 19.75 hours working on the motion [36] and some 7.05 hours working on plaintiffs' instant application for fees [37], yet the only support submitted shows 15 and two hours, respectively, for their lead counsel. *See* Young Declaration, Exhibit A. The court awards an additional $4,760 in fees thereupon.

(4)

The plaintiffs also request award for paralegal time. In *Bonanza Trucking Corp. v. United States, supra,* this court noted that statutes like EAJA contemplate "attorney fees",

> and a person not admitted to the bar, regardless of his or her experience or legal prowess, is not a lawyer.

> The question of a reasonable fee for such a person ... has been dealt with by other courts in at least three different ways. At one extreme, some courts have strictly construed attorney-fee provisions to allow only lawyers to be compensated.... On the other side, some courts have permitted such fees at the rates at which the clients were billed.... Finally, some courts award amounts commensurate with the law-firm rate of pay to the law clerk....

11 CIT at 444–45, 664 F.Supp. at 1459–60 (citations omitted). While this court was of the opinion in *Bonanza* that the third approach was most in line with congressional intent, and while the Supreme Court thereafter noted the existence of all three [38], it held that

> the "reasonable attorney's fee" provided for by statute should compensate the work of paralegals, as well as that of attorneys. The more difficult question is how the work of paralegals is to be valuated in calculating the overall attorney's fee.

**36.** *See* Young Declaration, para. 2.

**37.** *See id.,* para. 3.

**38.** *See Missouri v. Jenkins,* 491 U.S. 274, 284–85 n. 7, 109 S.Ct. 2463, 2470 n. 7, 105 L.Ed.2d 229 (1989).

The statute specifies a "reasonable" fee for the attorney's work product. In determining how other elements of the attorney's fee are to be calculated, we have consistently looked to the marketplace as our guide to what is "reasonable." In *Blum v. Stenson,* ... for example, we rejected an argument that attorney's fees for nonprofit legal service organizations should be based on cost. ...

If an attorney's fee awarded under [the statute] is to yield the same level of compensation that would be available from the market, the "increasingly widespread custom of separately billing for the services of paralegals and law students who serve as clerks," *Ramos v. Lamm,* 713 F.2d 546, 558 (CA10 1983), must be taken into account. ...

We reject the argument that compensation for paralegals at rates above "cost" would yield a "windfall" for the prevailing attorney.

*Missouri v. Jenkins,* 491 U.S. 274, 286–87, 109 S.Ct. 2463, 2471, 105 L.Ed.2d 229 (1989).

▪ Plaintiffs' papers do list separately individuals apparently paralegals, law clerks and/or summer associates. The stated hourly rates for those assistants for whom recovery is sought are $75 or $85. Before the court are opinions that

> the rates plaintiffs seek to recover for Mr. Floum's and his colleagues' time are consistent with market rates charged by attorneys with similar skill and experience in the San Francisco Bay area market during the relevant time period [39]

and that

> the rates requested by plaintiffs in their fee petition are comparable to rates charged by private attorneys in similarly specialized, environmental litigation.

Declaration of Paul P. Spaulding, III, para. 13. Accepting these views (in the absence of any fact or opinion to the contrary), as well as the teaching of *Jenkins, supra,* the court has reviewed all of plaintiffs' attorney-assistant entries and hereby concludes that an

**39.** Declaration of Michael Rubin, para. 7, pp. 5–6. *See also id.,* para. 8.

award of $7,603.50 [40] is in order for them.

The plaintiffs also seek recovery for the counsel of Heather A. Young. Their billing submissions add up to a total of 80.7 hours. *See* Floum Declaration, Exhibit C; Young Declaration, Exhibit A. In the latter declaration, paragraph 2, Ms. Young claims 5.6 hours of work on plaintiffs' motion to enforce the judgment, yet exhibit A, on its face, does not support this declaration, nor is the dollar sum in that paragraph properly reflective of the hours claimed multiplied by the stated rates. The same is true of the arithmetic in paragraph 3, wherein it is claimed that some time spent on the instant application has not been recorded and thus documented in this proceeding.

■ Not only do the defendants object to such inadequate representation, they also objected to the Young declaration, which is entitled "in support of plaintiffs' motion to enforce judgment", as an impermissible reply in support of that motion. It was, in part [41], for which the plaintiffs were admonished during the hearing thereon. In fact, the court also received at that time another filing of the same ilk, this one entitled Reply Memorandum in Support of Plaintiffs' Motion to Enforce Judgment. Clearly, practices in ignorance or disregard of the rules should not be rewarded beyond a paralegal rate, which according to plaintiffs' papers averages $85 per hour. Multiplying that figure by the 80.7 hours which the court finds compensable results in an additional award of $6,859.50 for the plaintiffs.

(5)

■ Plaintiffs' counsel have written off all of the expenses incurred in conjunction with the case in California. *See* Floum Declaration, Exhibit A, second section. As for proceedings here, pages 32–39 of exhibit B to that declaration list various Heller, Ehrman expenses characterizable essentially as copywork, delivery services, legal research, telecommunications, travel, word processing and

miscellaneous, which tally $10,699.98. In response to defendants' objection, the plaintiffs have agreed to strike the second entry on page 32. The court has reviewed all of the other entries and is constrained to strike the following, which it is unable to either decipher adequately or otherwise to approve:

| Ex.B Page | Date | Listed Amount |
|---|---|---|
| 32 | 8/8/94 | $ 17.10 |
| 32 | 9/27/94 | 43.85 |
| 32 | 9/27/94 | 5.60 |
| 32 | 9/29/94 | 10.75 |
| 32 | 8/15/95 | 136.00 |
| 34 | 9/30/94 | 220.80 |
| 35 | 5/24/94 | 10.00 |
| 35 | 5/24/94 | 10.00 |
| 35 | 9/28/94 | 82.00 |
| 35 | 3/21/95 | 37.10 |
| 35 | 10/11/95 | 10.00 |
| 35 | 10/31/95 | 29.00 |
| 36 | 9/28/94 | 72.00 |
| 39 | 9/12/95 | 39.29 |

That is, the court concludes that $9,856.49 in Heller, Ehrman expenses can be recovered by the plaintiffs, along with the $120 fee for filing their complaint, which is a "cost" within the meaning of 28 U.S.C. § 1920.

The Young declaration, paragraph 3, page 3 states that "Legal Strategies Group also has incurred $739.96 in costs associated with the fee application for which it has been billed since it [was] filed". There is no showing, however, that they fall within the ambit of section 1920 or otherwise are expenses subject to court review. In the absence of any substantiation, they must be disallowed. On the other hand, the court has been able to review page 5 of exhibit C to Mr. Floum's declaration and to conclude that the "additional charges" of his current firm, totalling $1,032.32, can be recovered herein.

Finally, plaintiff Earth Island Institute claims reimbursement for the $350 fee it paid Nicole J. Walthall for services rendered on the case after she had left Heller, Ehrman.

| Date | Name | Listed Amount |
|---|---|---|
| 5/26/92 | [None] | $19.00 |
| 8/19/94 | L.J. Pettigrew | 21.25 |

---

**40.** This sum has been derived by disallowing the following entries as inadequate and without other record support:

**41.** *Cf.* CIT Rule 7(d) and (g).

*See* Declaration of Todd Steiner, para. 15 and Exhibit E. This application is granted, but, for the reasons already indicated above, plaintiff Steiner's request for reimbursement for the expense of travelling to the court last year [42] cannot be allowed.

## IV

In view of the foregoing, and given the record developed to date in this case, the embargo enacted by Congress in Pub.L. No. 101–162, § 609(b), 103 Stat. 988, 1038, 16 U.S.C. § 1537 note and affirmed by the court's final judgment dated April 10, 1996 may not be, and therefore shall not be, enforced by the defendants and their officials, employees, servants, sureties and assigns in such a manner as to allow entry into the United States of any shrimp or products from shrimp harvested in the wild by citizens or vessels of nations which have not been certified in accordance with Pub.L. No. 101–162, § 609(b)(2), 103 Stat. at 1038, 16 U.S.C. § 1537 note.

Furthermore, the plaintiffs may recover from the defendants reasonable attorneys' fees and expenses and costs in the total amount of $340,467.56.

So ordered.

---

**42.** *See* Declaration of Todd Steiner, para. 14 and Exhibit D.